**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

KEARNEY PARTNERS FUND, LLC,
by and through
LINCOLN PARTNERS FUND, LLC,
Tax Matters Partner, et al.,

     Plaintiffs,

vs.            Case No. 2:10-cv-153-FtM-SPC

THE UNITED STATES OF AMERICA,
etc.

     Defendant.
_____

## ORDER

  This cause is before the Court with regard to the Motion for Summary Judgment by Plaintiffs in Civil Action Nos. 2:10-CV-154, 158, and 159 Regarding Pre-December 4, 2001 Partnership Income and Memorandum of Law in Support ("Motion for Summary Judgment" or "Motion") (Doc. No. 100), filed on September 21, 2012, Defendant's Memorandum in Opposition (Doc. No. 129), filed on November 13, 2012, and Plaintiffs' Reply in support of their Motion for Summary Judgment (Doc. No. 140), filed on November 26, 2012.  After a thorough review of the parties' submissions and the applicable law, the Court denies Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

  Plaintiffs initiated this federal income tax partnership proceeding challenging tax adjustments and penalty determinations made by the Internal Revenue Service ("IRS" or "Agency") to nine partnership returns under the Tax Equity and Fiscal Responsibility

Act of 1982 ("TERFA").[1]  (Doc. No. 52, p. 1.)  Kearney Partners Fund, LLC ("Kearney"), Nebraska Partners Fund, LLC ("Nebraska"), and Lincoln Partners Fund, LLC ("Lincoln") are Delaware limited liability companies that are treated as partnerships for federal income tax purposes and therefore, under the relevant tax laws and regulations, do not pay income taxes directly.  (Id., p. 3.)   Instead, their income flows through to the partnership owners who are liable for income tax in their separate and individual capacities.  26 U.S.C. § 701.  The suit was brought by Kearney by and through its tax matters partner, Lincoln, pursuant to 26 U.S.C. § 6226(a), which permits a taxpaying entity to challenge a Final Partnership Administrative Adjustment ("FPAA") finding by the IRS.[2]

On December 4, 2001, Mr. Raghunathan Sarma ("Sarma") acquired a direct partnership interest in Nebraska and indirect partnership interests in Lincoln and Kearney based on Nebraska's 99% ownership interest in Lincoln and Lincoln's 99% ownership interest in Kearney.  (Doc. No. 107, p. 5.)   This three-tiered partnership structure is referred to by the acronym "FOCus".  (Id.)  The controversy stems from nine partnership tax returns submitted to the IRS by the FOCus partnerships for tax periods ending in November 20, 2001 and December 4, 2011.  (Doc. No. 100, pp. 1-2.)

FOCus and "Straddle" FX Trades

---

[1]On September 2, 2010, this Court consolidated five related cases pursuant to Federal Rules of Civil Procedure 42(a), as they require consideration of a related set of transactions and legal issues.  (Doc. No. 28.)  The four cases accompanying the instant case are: Kearney Partners Fund v. United States, Case No. 2:10-cv-154-FtM-36DNF; Lincoln Partners Fund, LLC v. United States, Case No. 2:10-CV-157-FtM-36DNF; Nebraska Partners Fund, LLC v. United States, Case No. 2:10-CV-158-FtM-36DNF; and Lincoln Partners Fund, LLC v. United States, Case No. 2:10-CV-159-FtM-36DNF.

[2]A "tax matters partner" is a general partner designated by the applicable tax regulations to whom the IRS must mail notice of any FPAAs.  26 U.S.C. § 6223(a).

The origins of FOCus and its triumvirate partnerships are for the most part not in dispute.   In late-September 2001, Nebraska, Lincoln, and Kearney each filed their respective Certificates of Formation with the Delaware Secretary of State.  (Doc. No. 129, p. 6.)  When the partnerships were formed, an S-Corporation called Pensacola PFI owned a 99% interest in Nebraska, while Bricolage Capital, a New York City based hedge fund, owned the remaining 1%.  (Id.)  Pensacola PFI was owned equally by ASA Trading, LLC and JJC Trading, LLC, which were respectively owned by Andrew Ahn and Jason Chai.  (Id., p. 8.)  Nebraska, in turn, owned a 99% interest in Lincoln and Bricolage Capital owned the remaining 1%.  (Id., p. 6.)  Finally, Lincoln owned a 99% interest in Kearney, while Delta Currency Trading Company owned the final 1%.  (Id.; Doc. No. 100, p. 6.)  All three partnership entities had the same mailing address. (Doc. No. 129, p. 6.)

Once FOCus was formed, the tiered-partnerships engaged in a series of complex transactions that Defendant alleges lacked economic substance and were designed to generate an artificial loss in income that permitted an investor like Sarma to reduce or eliminate a substantial federal tax liability.  The details of the transactions are complex and to some degree, the minutia of which are not essential to resolution of this Motion. However, the Court will summarize portions of the transactions that set the backdrop for the Court's analysis.

From October 19 to November 13, 2001 and between November 30 and December 13, 2001, Kearney took part in "straddle" foreign exchange ("FX") trades with Credit Suisse First Boston ("Credit Suisse").[3]  (Id., p. 7.)  A straddle trade typically

---

[3]See Expert Report of Dr. Timothy M. Weithers (Doc. No. 129-21) for a detailed explanation of the currency trades conducted by FOCus.

involves the opportunity to buy (a call) and sell (a put) an option in the same commodity, security, or other investment.  Each of the options is referred to as a "leg" of the straddle.  In foreign exchange trading, the success of either leg of the straddle is a function of the exchange rate difference between two nations' currencies.  <u>See</u> <u>generally</u> Doc. No. 129-21.  Approximately $39,851,015,082.88 of trades was conducted in less than four-weeks with an overall net profit of $893.05.  (Doc. No. 129, p. 7.)

Despite the nominal net profit achieved, one "leg" of the straddle trade produced nearly $80 million in gain to Kearney and a corresponding loss to Credit Suisse, whereas the other "leg" produced a nearly equal loss to Kearney and gain to Credit Suisse.  (Doc. No. 100, p. 6.; Doc. No. 129, p. 7.)  Kearney's gain flowed through to Lincoln, Nebraska, Pensacola PFI (by virtue of its 99% interest in Nebraska), and eventually to Andrew Ahn and Jason Chai, who each reported $754,050,058 on their 2001 federal income tax returns.  (Doc. No. 100, p. 7; Doc. No. 129, pp. 8-9.)  Neither Ahn nor Chai, however, were taxed on the gain, which was offset through a "mark to market election."[4]  (Doc. No. 129, p. 8.)  In contrast, the loss from the investments was "locked in" and suspended on Kearney's books.  (Doc. No. 129, p. 7.)  It is undisputed that Sarma did not own an interest in FOCus or its tiered partnerships and did not reap any gains or income from these transactions prior to December 4, 2001.

<u>Sarma Acquires Partnerships and Reports a Capital Loss</u>

On December 4, 2001, Sarma acquired Nebraska (the 99% interest held by

_____

[4]A mark-to-market election is an accounting method, whereby "[a] taxpayer engaged in a trade or business as a trader in securities may elect to recognize gain or loss on any security held in connection with the trade or business at the close of the taxable year as if the security were sold for its fair market value at yearend."  <u>Knish v. Comm'r</u>, 92 T.C.M. 498, (2006); 26 U.S.C. § 475(f).

Pensacola PFI) for $3,862,530.48, later purchased Nebraska's 99% interest in Lincoln for $2,306,674, and then transferred approximately $36 million of his own funds into Lincoln. (Doc. No. 100, pp. 8, 10.) Next, Credit Suisse and Lincoln took part in a series of leveraged currency exchanges, which were structured to limit the amount of gain or loss that Lincoln could incur. (Doc. No. 129, p. 10.) In connection with the trade, Credit Suisse lent Lincoln $38,800,000, which Sarma personally guaranteed. (Id.)

According to the Defendant, Sarma's purchase of Nebraska and Lincoln made him a 99% owner of Kearney and the fixed losses that stemmed from the initial FX trades. However, Defendant alleges that Sarma's initial purchase of and cash contributions to Lincoln did not provide the sufficient investor basis needed to fully utilize Kearney's losses for tax reduction or tax elimination purposes.[5] Thus, Sarma purportedly guaranteed the Credit Suisse loan to increase his basis in the partnership so that he could deduct the entire flow-through losses of the FX trade from his overall taxable income. (Id., pp. 10-11.)

On December 19, 2001, two days after Sarma purchased Nebraska, Lincoln sold Kearney to Fermium II Partners Fund. (Id., p. 11.) The sale generated a capital loss of $78,292,194, which Lincoln reported on its partnership tax return for the period beginning December 15, 2001 and ending December 31, 2001. (Id.) Relying on his 99% interest in Lincoln, Sarma reported a capital loss of $77,608,272. (Id.)

Prior to his involvement with FOCus, Sarma was a 50% shareholder in American Megatrends, Inc., a subchapter-S corporation. (Id., p. 3.) In 2001, American

---

[5]A partner's tax basis in a partnership is generally increased by the partner's share of income in the partnership or through the partner's share of partnership liabilities, through for example personally guaranteeing a loan on behalf of the partnership. See 26 U.S.C. §§ 722, 752.

Megatrends sold a significant portion of its assets, resulting in a major capital gain for the company, $80,964,502 of which flowed to Sarma individually. (Id.)  Sarma relied on the capital loss generated from FOCus to offset a substantial portion of his tax liability in the American Megatrends sale.

IRS Challenges FOCus and Its Tax Returns

In early 2002, the IRS began an investigation of FOCus and later Bricolage Capital and its involvement in the partnerships.  On June 25, 2002, the IRS issued a Notice of Beginning of Administrative Proceeding ("NBAP") asserting its intent to challenge the multi-tier partnership structure and the tax benefits allocated to Sarma. (Doc. No. 107, p. 9.)  The Agency concluded its investigation by issuing FPAAs to the FOCus partnerships and all partners, including Sarma for the tax periods ending in November 20, 2001 and December 4, 2001.  See Doc. No. 100-5.

The FPAAs demanded adjustments to tax returns submitted by Sarma and the partnerships.  They determined that Nebraska, Lincoln, and Kearney were formed for tax avoidance purposes, and in furtherance of such purpose, engaged in a prearranged series of transactions designed to create an artificial economic loss that was devoid of economic substance and a legitimate business purpose.  (See, e.g., id., p. 11.)  The FPAAs also asserted that FOCus' tax loss principally was generated to substantially reduce its partners' total federal tax liabilities in violation of the IRS tax code.  (Id.)  In addition to making substantive adjustments to the partnerships' tax returns, the FPAAs imposed substantial accuracy-related penalties after concluding that there had been no showing of good faith or reasonable cause for the tax underpayments.  (Id., p. 12.)

## APPLICABLE STANDARDS

Summary judgment is warranted when there is no genuine issue as to any

material fact. Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Baby Buddies, Inc. v. Toys R Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010) (internal quotation marks and citations omitted).  A fact is "material" if it may affect the outcome of the case under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing the absence of a genuine issue of material fact by identifying relevant pleadings, depositions, answers to interrogatories, admissions, and/or affidavits.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004).

To avoid the entry of summary judgment, the non-moving party must offer enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find a genuine issue of a material fact.  Liberty Lobby, Inc., 477 U.S. at 247-48. However, the non-moving party may not simply rely on beliefs, conjecture, speculation, or conclusory allegations.  Instead, the party faced with a properly supported summary judgment motion must come forward with extrinsic evidence that meets "the substantive evidentiary standard of proof that would apply at trial on the merits," including affidavits, depositions, answers to interrogatories, and/or admissions.  Celotex, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).

When evaluating a summary judgment motion, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party.  Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).  "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment."  St. Charles Foods Inc. v. Am.'s Favorite

Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (internal quotation marks and citations omitted).

## DISCUSSION

Plaintiffs challenge tax adjustments and penalty determinations made for tax periods ending on November 20, 2001 and December 4, 2001 and contend that the IRS erred in determining that FOCus was formed and availed of solely for tax avoidance purposes.  Plaintiffs contest two principal conclusions reached by the IRS: (1) FOCus, the entire set of transactions comprising FOCus, and all gains and losses emanating from the tax shelter lack economic substance and should be nullified; or alternatively (2) if the transactions generating the capital loss claimed by Sarma are respected, then the purported gains from those transactions should be reallocated to Sarma, thereby reversing his tax benefits from the FOCus partnership.

1. The Jurisdiction of the Court to Disregard FOCus and Its Transactions

In response to the IRS' first theory, Plaintiffs contend that the Court has no jurisdiction to assess the purportedly novel argument that FOCus and all of its transactions should be disregarded for tax purposes.  (Doc. No. 100, p. 24.)  They maintain that the Court may only review the partnership items adjusted in the FPAAs and the underlying theories behind those tax adjustments.  Accordingly, Plaintiffs argue that this Court may not consider whether FOCus and the FX trades should be disregarded because the FPAAs recognized the income from the FX trades and reallocated them to Sarma.  Plaintiffs have described too tight a circle around the scope of this Court's jurisdiction.

Under section 6226(f) of the Tax Code, the Court has:

jurisdiction to determine all partnership items of the partnership for the

partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.[6]

26 U.S.C. § 6226(f).   In a TERFA proceeding, "an FPAA is the functional equivalent of a notice of deficiency."   Sealy Power, Ltd. v. Comm'r, 46 F.3d 382, 385-86 (5th Cir. 1995). They both serve to notify the taxpaying entity that the IRS has determined an adjustment or tax deficiency for a particular year.   Id. at 386.   Accordingly, we analyze the FPAA as we would analyze a notice of deficiency, by conducting a *de novo* review of tax adjustments made by the IRS in the FPAA.   See, e.g., Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 43 (Fed. Cl. 2007) aff'd in part, vacated in part, rev'd in part sub nom. Jade Trading, LLC ex rel. Ervin v. United States, 598 F.3d 1372 (Fed. Cir. 2010) ("This Court makes a de novo determination regarding the partnership items of [the plaintiff] that were adjusted by the FPAA."); Atlantic Richfields Co. v. Dept. of the Treasury, No. 96-2867, 1996 WL 788366, at *1 (D.D.C. Dec. 31, 1996) ("A court hearing plaintiffs' readjustment petition would have jurisdiction to determine *de novo* . . . taxable income, deductions, and credits . . . .").   And while the IRS' determinations are presumed to be correct and Plaintiff bears the burden of providing otherwise, "[t]he factual and legal analysis employed by the Commissioner [of the IRS] is of no consequence to the district court."   R.E. Dietz Corp. v. United States, 939 F.2d 1, 4 (2d Cir. 1991); Zuhone v. Comm'r, 883 F.2d 1317, 1326 (7th Cir. 1989) ("if the [tax]

---

[6]A "partnership item" is broadly defined as "any item required to be taken into account for the partnership's taxable year," 26 U.S.C. § 6231(a)(3), including "[t]he partnership aggregate and each partner's share of . . . [i]tems of income, gain, loss, deduction, or credit of the partnership," 26 C.F.R. § 301.6231(a)(3)-1(a)(1), as well as "the accounting practices and the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction etc."   Id. § 301.6231(a)(3)-1(b).

assessment is right on any theory it must be sustained."); Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987) ("In general, courts will not look behind an assessment to evaluate the procedure and evidence used in making the assessment."); Estate of Horvath v. Comm'r, 59 T.C. 551, 555 (1973) ("It is well settled that the [IRS'] determination may be affirmed for reasons other than those assigned in his notice of deficiency."). The rationale for this rule is that the FPAA, much like the notice of deficiency, "merely hails the taxpayer into court. The Tax Court has as its purpose the redetermination of deficiencies, through a trial on the merits, following a taxpayer petition . . . . Issuing a notice of deficiency is in many ways analogous to filing a civil complaint . . . ."). Zuhone, 883 F.2d at 1326 (internal quotation marks omitted). Therefore, the Court need not limit itself to the precise theories espoused by the FPAA in assessing the IRS' tax adjustments.

On occasion, courts have declined to evaluate new theories for tax adjustments not set forth in the initial notice of deficiency, but only when surprise and prejudice exist. Plaintiffs cite to one such case. In Seligman v. Comm'r, 84 T.C. 191 (1985), the taxpayer objected that the IRS raised two new theories to support its conclusion that the taxpayer was not entitled to an investment tax credit. After indicating that it "possesses the inherent authority to sustain the [IRS'] determination for reasons other than those assigned in his notice of deficiency," the court nonetheless declined to evaluate the theories, emphasizing that the taxpayers "were clearly surprised and prejudiced," were "denied . . . the opportunity to present on this issue because the pleadings did not alert them to this contention," and that the court was deprived of "complete argument and research of such contentions . . . ." Id. at 198-99. In contrast here, Plaintiffs point to no such prejudice and indeed anticipated in their Summary Judgment Motion that the IRS

would argue that FOCus and all of its transactions should be disregarded.

Moreover, both of Defendant's theories – disregarding FOCus and the FX trades as opposed to reallocating the gains achieved by FOCus – rely on the same principles of tax law espoused by the FPAAs and are predicated on the same conclusion that FOCus was an abusive tax shelter.  The FPAAs reference the judicial doctrines of economic substance and step transaction to declare that FOCus and its partnerships were formed solely for tax avoidance purposes, that their transactions, including the purchases and sales of interest in Nebraska, Lincoln, and Kearney, and the purchase and sale of foreign currency contracts "was a sham, lacked economic substance, and was not engaged in for a legitimate business purpose."  See, e.g., Doc. No. 100-5, p. 11.

The economic substance doctrine is an axiomatic principle in tax law that the substance, rather than the form of a transaction controls for tax purposes.  In applying this doctrine, the Supreme Court emphasized that courts must assess the objective economic realities of a transaction rather than the particular form the parties employed in order to assess tax liability.  Comm'r v. Tower, 327 U.S. 280, 291 (1946).  Thus, "[i]f the taxpayer enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it . . . ."  Nevada Partners Fund, LLC ex rel. Sapphire II, Inc. v. United States, 714 F. Supp. 2d 598, 621 (S.D. Miss. 2010).  The step-transaction doctrine is a derivative of the broader "substance over form" theory and provides that "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction."  Comm'r v. Clark, 489 U.S. 726, 738 (1989).  And by "'linking together' all interdependent steps with legal or business significance," id., the "true nature of a transaction" will be revealed and

the tax consequences of a sale of property may be determined.  Comm'r v. Court Holding Co., 324 U.S. 331, 334 (1945).  Courts have applied the broader substance over form doctrine and the step-transaction theory to "give effect either to both the cost and income functions [of a transaction], or to neither."  ACM P'ship v. Comm'r, 157 F.3d 231, 261 (3d Cir. 1998).

Defendant suggests doing the same.  The FPAAs provide that because FOCus and the FX straddle trades lack economic substance, Sarma should be prohibited from relying on the artificial losses generated from the FX trades in order to reduce his tax liability.  Accordingly, the FPAAs rely on Treasury Regulation § 1.701.2, also known as the "partnership anti-abuse regulation," to reallocate the gains from the partnerships to Sarma in order to counteract the tax benefits obtained from the losses.  See Doc. 100-5, p. 11 (citing 26 C.F.R. § 1.701-2).  Defendant's Summary Judgment Motion alternatively proposes disregarding all of FOCus and the transactions.  The two methods are predicated on the finding that FOCus lacks economic substance and they both aim to achieve the same objective – prohibit Sarma from gaining tax benefits from a purportedly artificial loss that derives from a series of transactions that had no legitimate business purpose.  See Grojean v. Comm'r, 248 F.3d 572, 576 (7th Cir. 2001) ("the doctrine of substance over form allows only the government to recharacterize a transaction in accordance with its commercial significance.").  The Court has jurisdiction to assess both these claims.  For these reasons, the Court denies Plaintiffs' Summary Judgment Motion.[7]

---

[7]Plaintiffs assert that Defendant's 30(b)(6) Representative and author of the FPAAs at issue confirmed that the IRS FPAAs disregard FOCus and its entities, but not the investments entered into by the entities.  (Doc. No. 100, p. 24.)  However, as mentioned earlier, this Court will not limit its assessment of the FPAAs to the precise

2.  Reallocating Partnership Income to Sarma

Plaintiffs argue that the income generated from FOCus should not be retroactively reallocated to Sarma who had no interest in the FOCus partnerships prior to December 4, 2001.  (Doc. No. 100, pp. 12-13.)  In support, Plaintiffs cite to (id., p. 23) a well-established principle of taxation that income must be taxed to one who earns or enjoys "'complete dominion' over a given sum."  Comm'r v. Indianapolis Power & Light Co., 493 U.S. 203, 210 (1990); see also Comm'r v. Banks, 543 U.S. 426, 434 (2005).  According to Plaintiffs, Sarma cannot be taxed on gains derived from the FX trades, which occurred during the two years preceding his ownership of the partnerships.  Plaintiffs' argument ignores the economic substance doctrine which provides that legal formalities should be eschewed in favor of the economic realities of a transaction when assessing tax liability.

Plaintiffs are correct that as a general matter, income is taxed based on ownership.  However, determining ownership for taxation purposes "is an intensely practical process concerned less with legal formalities than with economic realities . . . ."  Anderson v. Comm'r, 164 F.2d 870, 873 (7th Cir. 1947).  Thus, "command over property or enjoyment of its economic benefits marks the real owner for federal income tax purposes."  Speca v. Comm'r, 630 F.2d 554, 557 (7th Cir. 1980) (quoting Anderson, 164 F.2d at 873).[8]  It is Defendant's contention that although Sarma formally acquired an

_____

statements of the notices or their authors.  Plaintiffs may cite to this evidence, but not to argue that this Court lacks jurisdiction.

[8]Plaintiffs attempt to distinguish Anderson and Speca because they involve transfers of property between family members.  However, several other courts have relied on the same standard outside of the familial context.  See, e.g., Pacific Coast Music Jobbers, Inc. v. Comm'r, 55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972) ("A court must consider not only when the bare legal title passed but also when the benefits and burdens of the property or the incidents of ownership, were acquired . .

interest in the partnerships on December 4, 2001, the preceding FX trades were integrated parts of a scheme designed to generate a loss that could later provide substantial tax benefits to a wealthy investor such as Sarma.  Thus, Defendant maintains that because Sarma received substantial tax benefits from FOCus and the FX trades, he should be deemed the beneficial owner of either the partnerships or the income generated from the partnerships.

In support, Defendant cites to a September 20, 2001 meeting between Mrs. Sarma, Dennis Sabourin, Sarma's attorney, and representatives of KPMG, First Union, and Bricolage Capitol, wherein KPMG displayed a Power Point presentation of an investment strategy designed to produce substantial tax savings.  (Doc. No. 129, p. 4 (citing Doc. Nos. 129-11, 129-12, 129-13.))  The proposed strategy resembles FOCus and the series of trades and transactions entered into before and after Sarma formally acquired an interest in the partnerships.  The Power Point slides outlined eleven steps to the "investment structure": steps one through three aimed to establish a three-tiered structure of LLCs which would engage in trades and investments intended to yield equal amounts of gains and losses (Doc. No. 129, p. 4); steps four through six provided that an investor would purchase the three-tier LLC structure and contribute enough capital to the partnerships to establish a sufficient basis that would allow the investor to take full advantage of the losses generated by the trades (id., p. 5); in step seven, the second tier of the partnerships would rely on a loan guaranteed by the investor to invest in foreign currency options (id.); in step eight, the investor fulfills his capital contribution obligation by transferring a large sum of his own money into the partnerships (id., p. 6);

. . A court should look to practicalities, disregarding merely formal and not useful rights and attributes."); Ragghianti v. Comm'r, 71 T.C. 346, 349 (1978).

in step nine, the third tier of the partnerships recognizes its previously unrecognized losses stemming from the prior investments, which would then flow through to the investor (id.); and finally in steps ten and eleven, once the partnerships generated the loss to be used by the investor to offset taxes on the investor's independent income, the investor and the partnerships would engage with Bricolage in an investment program for at least three additional years. (Id.)

Thus even though as Plaintiffs suggest, there is no direct evidence of Mr. Sarma's formal ownership of FOCus prior to December 4, 2001 or approval of the FX trades, Defendant has offered enough evidence to create a material issue over whether Mr. Sarma intended to benefit from the inception of FOCus and the losses generated through an interrelated series of transactions and investments. See Klamath Strategic Inv. Fund v. United States, 568 F.3d 537, 544-45 (5th Cir. 2009) (holding that courts should not "reward a 'head in the sand' defense where taxpayers can profess a profit motive but agree to a scheme structured and controlled by parties with the sole purpose of achieving tax benefits for them.").

In the only other case to address the tax consequences of FOCus in nearly identical circumstances, the court in Nevada Partners Fund, 714 F. Supp. 2d at 632, concluded after a bench trial that "the FOCus steps were a series of transactions lacking economic substance and comprising an abusive tax shelter designed to permit an investor such as James Kelley Williams to purchase losses embedded in a tiered partnership . . . ." In Nevada, the plaintiff, like Sarma stood to realize significant gains from his poultry producing company. Seeking to avoid paying taxes on the gains for the 2001 tax year, the plaintiff and his attorneys met with a KPMG agent and Bricolage Capital, wherein they were informed through a nearly identical Power Point presentation

of FOCus and its potential to produce a substantial loss that could later be used for tax avoidance purposes.  Id. at 605.  The court relied on the economic substance doctrine to conclude that FOCus constituted an abusive tax shelter devoid of a viable business purpose.  Id. at 633.  And even though the straddle trades that generated the loss occurred prior to plaintiff's formal ownership of FOCus, the Court nevertheless held that the IRS could "recast the FOCus transactions to produce tax . . . ."  Id. at 634. Defendants should likewise be permitted to make the same case.

Plaintiffs next argue that Defendant's reallocation theory impermissibly recognizes the economic substance of the FX trades while attempting to reallocate the gains and losses from the trades to Sarma.  The implication of Plaintiffs' argument is that either FOCus and its transactions should be disregarded as a sham or if they are be found to have economic substance, the Court should honor the existing allocation of the gains and losses that flow from the partnerships.  However, the Treasury Regulations and tax law doctrines specifically permit the IRS' reallocation method.

As a complement to the common-law economic substance doctrine, the Treasury Department has issued Treasury Regulation § 1.701-2.  26 C.F.R. § 1.701–2.  In substance, the regulation permits the IRS to disallow or recast some or all partnership transactions that have tax consequences inconsistent with the intent of tax law. Specifically, the regulation provides that the IRS may recast a transaction for federal tax purposes "if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K."  Id. § 1.701–2(b).  The IRS may, among other things, determine that "[t]he purported partnership should be disregarded in whole or in part, and the

partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners."   Id. § 1.701–2(b)(1).   See also Comm'r v. Court Holding Co., 324 U.S. 331, 333-34 (1945) (holding that the Tax Court was justified in relying on the economic substance doctrine to "attribut[e] the gain from the sale to respondent corporation."); Grojean, 248 F.3d at 576; Nevada Partners Fund, 714 F. Supp. 2d at 633-34 (concluding that because FOCus lacked economic substance, "the IRS recasting of the FOCus transaction to produce tax pursuant to Section 1.701-2 of the Income Tax Regulations was appropriate.").

Equally unavailing is Plaintiffs' assertion that Supreme Court and Eleventh Circuit precedent prohibit this form of income reallocation.  It is true that in Frank Lyon Co. v. United States, 435 U.S. 561, 584 (1978), the Supreme Court declared that "the Government should honor the allocation of rights and duties effectuated by the parties" that flow from a multiple-party transaction with economic substance.  However, in so concluding, the Court emphasized that there must be a "genuine" transaction "imbued with tax-independent considerations," and "not shaped solely by tax-avoidance features that have meaningless labels attached . . . ."  Id. at 583-84.  United Parcel Serv. of Am. v. Comm'r, 254 F.3d 1014, 1020 (11th Cir. 2001) is distinguishable on the same basis, as the court ultimately held that the challenged transactions had "real economic effects and a business purpose" apart from any tax-avoidance motive.

In contrast, here, Defendant proposes reallocation of the FOCus gains to offset purportedly illegitimate tax benefits obtained by Sarma through an investment strategy that allegedly lacks a viable economic purpose.  Reallocation of the gains in this context is specifically provided for by the Treasury Regulations and tax law.  For these reasons,

the Court denies Plaintiffs' Summary Judgment Motion.[9]

## CONCLUSION

It is hereby **ORDERED AND ADJUDGED** that the Motion for Summary Judgment by Plaintiffs in Civil Action Nos. 2:10-CV-154, 158, and 159 Regarding Pre-December 4, 2001 Partnership Income and Memorandum of Law in Support (Doc. No. 100) is **DENIED**.

**DONE AND ORDERED** in Chambers in Fort Myers, Florida, on April 25, 2013.

_____
ROY B. DALTON JR.
United States District Judge

Copies:

Parties and Counsel of Record

---

[9]Because Plaintiffs' Summary Judgment Motion addresses the Court's jurisdiction and ability to assess Defendant's tax-adjustment theories rather than the merits of Defendant's claims, the Court does not here apply the judicial doctrines or the regulatory anti-abuse rule.