**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

KEARNEY PARTNERS FUND, LLC,
by and through
LINCOLN PARTNERS FUND, LLC,
Tax Matters Partner, et al.,

                Plaintiffs,

vs.                                             Case No. 2:10-cv-153-FtM-SPC

UNITED STATES OF AMERICA, etc.

                Defendant.

---

## ORDER

This cause is before the Court on the Motion for Summary Judgment by Plaintiffs Regarding Announcement 2002 and Waiver of Penalties and Memorandum of Law in Support ("Plaintiffs' Motion for Summary Judgment" or "Plaintiffs' Motion") (Doc. No. 103), filed on September 21, 2012, Defendant's Opposition (Doc. No. 131), filed on November 16, 2012, Plaintiffs' Reply in support of their Motion (Doc. No. 143), filed on November 29, 2012, United States of America's Motion for Partial Summary Judgment and Supporting Memorandum of Law ("Defendant's Motion for Summary Judgment" or "Defendant's Motion") (Doc. No. 101), filed on September 21, 2012, Plaintiffs' Opposition (Doc. No. 130), filed on November 16, 2012, and United States of America's Reply (Doc. No. 144), filed on November 29, 2012. After a careful review of the parties' submissions and the applicable law, the Court denies in part and grants in part both parties' Summary Judgment Motions.

1

**BACKGROUND**

In this tax case, Plaintiffs filed suit against Defendant United States of America for the readjustment of nine partnership tax returns under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"). (Doc. No. 52, p. 1.) The case involves a complex series of financial transactions undertaken by a three-tiered partnership known as "FOCus," which consists of three Delaware incorporated limited liability companies: Nebraska Partners Fund, LLC ("Nebraska"), Lincoln Partners Fund, LLC ("Lincoln"), and Kearney Partners Fund, LLC ("Kearney"). On December 4, 2001, Mr. Raghunathan Sarma ("Sarma") became the controlling member of and acquired a direct partnership interest in Nebraska. Through his interest in Nebraska, Sarma obtained indirect partnership interests in Lincoln and Kearney based on Nebraska's 99% ownership interest in Lincoln and Lincoln's 99% ownership interest in Kearney. (Doc. No. 107, p. 5.)

In January 2002, the IRS issued Announcement 2002-2 ("Announcement" or "Announcement 2002"), a disclosure initiative inviting taxpayers to disclose their tax treatment of certain unauthorized tax shelters. (Doc. No. 103-5.) For any item voluntarily disclosed by taxpayers in accordance with the initiative, the IRS agreed to waive accuracy-related penalties that would otherwise be triggered by the underpayment of taxes. On April 23, 2002, Sarma's attorney Dennis Sabourin filed a voluntary disclosure ("disclosure") with the IRS, which indicated Sarma's involvement in the FOCus partnerships. (Doc. No. 102-1.)

On June 25, 2002, the IRS issued a Notice of Beginning of Administrative Proceeding ("NBAP") notifying Plaintiffs of its intent to challenge FOCus and the tax

benefits allocated to Sarma from the partnerships. (Doc. No. 107, p. 9.) The Agency concluded its investigation by issuing Final Partnership Administrative Adjustments ("FPAA") to the FOCus partnerships and all partners, including Sarma, for the tax periods ending in November 20, 2001, and December 4, 2001.[1] (See Doc. No. 100-5.) The FPAAs determined that Nebraska, Lincoln, and Kearney were formed for tax avoidance purposes, and in furtherance of such purposes, engaged in a prearranged series of transactions engineered to create an artificial economic loss that lacked economic substance and a legitimate business purpose. (Id. at 25.) Specifically, it is alleged that the FOCus partnerships took part in "straddle" foreign exchange ("FX") trades that achieved a nominal net profit, but resulted in a substantial loss that was later used by Sarma to obtain substantial tax benefits. The FPAAs made substantive adjustments to the partnerships' tax returns and imposed substantial accuracy-related penalties. The parties' cross-motions for summary judgment primarily concern these penalties.

## APPLICABLE STANDARDS

Summary judgment is warranted when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys R Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010) (citations and internal quotation marks omitted). A fact is "material" if it may affect the outcome of the case under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing the absence of a genuine issue of material

---

[1]For all intents and purposes, the three FPAAs issued to the partnerships are the same.

fact by identifying relevant pleadings, depositions, answers to interrogatories, admissions, and/or affidavits. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004).

To avoid the entry of summary judgment, the non-moving party must offer enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find a genuine issue of a material fact. Liberty Lobby, 477 U.S. at 247-48. However, the non-moving party may not simply rely on beliefs, conjecture, speculation, or conclusory allegations. Instead, the party faced with a properly supported summary judgment motion must come forward with extrinsic evidence that meets "the substantive evidentiary standard of proof that would apply at trial on the merits," including affidavits, depositions, answers to interrogatories, and/or admissions. Celotex, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).

When evaluating a summary judgment motion, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods Inc. v. Am.'s Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (citations and internal quotation marks omitted).

When faced with cross-motions for summary judgment, a court must consider each motion on its own merits. Shook v. United States, 713 F.2d 662, 665 (11th Cir. 1983). Where both parties "disagree as to the facts and take inconsistent legal theories[,] the mere filing of cross motions for summary judgment does not warrant the

entry of such judgment." Id.

## DISCUSSION

The parties' cross-motions for summary judgment concern certain accuracy-related penalties added to Plaintiffs' tax obligations for tax periods ending on November 20, 2001, and December 4, 2001. The IRS imposed the penalties despite the April 23, 2002 disclosure filed by Sarma's attorney. According to the IRS, the disclosure did not comply with the terms of Announcement 2002. Plaintiffs move for summary judgment on their claims that the applicable penalties should be waived on account of Sarma's disclosure and that the IRS should not be permitted to provide the reasons for denying penalty relief. Plaintiffs also argue that Defendant's Rule 30(b)(6) witness was unprepared to answer questions about the Announcement and that this Court should order Defendant to provide another witness.

Before addressing the merits of Plaintiffs' Motion, the Court must first determine whether review is authorized. Specifically, Defendant argues that under the Administrative Procedures Act ("APA"), the Court may not review the IRS's penalty determinations pursuant to Announcement 2002 and that the Court lacks subject matter jurisdiction to assess whether the disclosure is a defense to the penalties.

### 1. Is Judicial Review Appropriate?

The APA establishes a broad presumption of judicial review of final agency action. 5 U.S.C. § 702. "This is 'just' a presumption, however," and in some cases, agency action is committed to agency discretion by law and unreviewable by the courts. Lincoln v. Vigil, 508 U.S. 182, 190-91 (1993). The APA sets forth two important exceptions to this presumption: (1) when "statutes preclude judicial review," or (2) when

"agency action is committed to agency discretion by law." Id. at 191 n.3. Judicial review, however, is the rule, and non-reviewability is a narrow exception which must be clearly demonstrated. Greenwood Utils. Comm'n v. Hodel, 764 F.2d 1459, 1464 (11th Cir. 1985).

Defendant invokes the latter exception and argues that its denial of penalty relief under Announcement 2002 is "committed to agency discretion by law" and therefore unreviewable. Plaintiffs respond that the judiciary may review the IRS's compliance with its own rules and regulations when they impose binding norms on the Agency and when they confer certain rights to taxpayers.

Over the years, a substantial body of law has developed to help discern administrative decisions that are "traditionally left to agency discretion," Lincoln, 508 U.S. at 191, from reviewable agency actions that have the force and effect of law. Chrysler Corp. v. Brown, 441 U.S. 281, 295 (1979). As a general matter, "an administrative agency is not a slave of its rules." Health Sys. Agency of Okla. v. Norman, 589 F.2d 486, 490 n.5 (10th Cir. 1978) (citation and internal quotation marks omitted). Thus, it is well established that rules and policies governing internal agency operations do not have the force and effect of law, do not create substantive rights in the public, and are not binding on the agency issuing them. Tsegay v. Ashcroft, 386 F.3d 1347, 1355 (10th Cir. 2004). In contrast, rules promulgated by a federal agency which regulate the rights and interests of others are controlling upon the agency. Columbia Broad. Sys., Inc. v. United States, 316 U.S. 407, 422 (1942).

In its seminal decision in Accardi v. Shaughnessy, 347 U.S. 260 (1954), the Supreme Court first applied this doctrine in an immigration case, when it vacated a

removal order of the Board of Immigration Appeals due to the Board's failure to adhere to procedures set forth in the applicable regulations. The Board was required by regulations promulgated by the Attorney General to "exercise such discretion and power conferred upon the Attorney General by law." Id. at 266. The petitioner argued that the Attorney General had distributed a list of "unsavory characters," including Accardi, whom the Board removed without exercising its discretion. Id. at 264. The Supreme Court held that Accardi was entitled to a new hearing before the Board because the Attorney General had supplanted the Board's independent discretion and had dictated the Board's decision to remove the petitioner in violation of the applicable regulations. Id. at 268. Accardi was subsequently applied in Service v. Dulles, 354 U.S. 363, 388 (1957), and Vitarelli v. Seaton, 359 U.S. 535, 539-40 (1959), to vacate the discharges of government employees due to the Departments of State and the Interior's respective failures to adhere to their employee discharge procedures.

The breadth of Accardi and its progeny, however, was narrowed in American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538 (1970), where the Court clarified that not every violation of a rule or regulation invalidates an agency action and is subject to judicial review. There, the Court invoked an explicit prejudice requirement to reviewing and sustaining an Interstate Commerce Commission ("ICC") award of temporary operating authority in spite of the ICC's failure to comply with regulations requiring applicants to document efforts to obtain service from other carriers. Id. Ultimately, the Court distinguished the regulation at issue as a mere "procedural rule[ ] adopted for the orderly transaction of business" intended to "aid the Commission in exercising its discretion," from a rule "intended primarily to confer important procedural

benefits upon indiv[i]duals in the face of unfettered discretion." Id. at 538-39. In concluding that an agency may "relax or modify its procedural rules," the Court held that the action was "not reviewable except upon a showing of substantial prejudice to the complaining party." Id. at 539.

Since American Farm Lines, courts have adopted different approaches to incorporating the prejudice requirement into the Accardi doctrine. See Leslie v. Attorney Gen. of U.S., 611 F.3d 171, 177 (3d Cir. 2010) (listing cases and their divergent approaches to the prejudice requirement). In Port of Jacksonville Maritime Ad Hoc Committee, Inc. v. U.S. Coast Guard, 788 F.2d 705, 708 (11th Cir. 1986), the U.S. Court of Appeals for the Eleventh Circuit set forth the following framework governing review of an agency's deviation from its own regulations and rules:

> Determine whether the regulation was intended 1) to require the agency to exercise its independent discretion, or 2) to confer a procedural benefit to a class to which complainant belongs, or 3) to be a 'mere aid' to guide the exercise of agency discretion. If the first or second, [review and] invalidate the action; if the third, a further determination must be made whether the complainant has been substantially prejudiced. If he has, invalidate the action; if not, affirm.

This framework or variations of it have been applied to regulations, internal guidelines, or agency pronouncements. See, e.g., id. at 709; Ngure v. Ashcroft, 367 F.3d 975, 982-83 (8th Cir. 2004); FPL Food, LLC v. U.S. Dep't of Agric., 671 F. Supp. 2d 1339, 1353 (S.D. Ga. 2009) (noting that the D.C. Circuit and at least three other circuits have held that "agency pronouncements are only binding when the agency intended to be bound by the pronouncement").

The Court now turns to the question of whether the IRS's compliance with Announcement 2002 is subject to judicial review. Plaintiffs offer two theories to allege

that penalty relief was warranted under Announcement 2002. First, they argue that the contents of the disclosure satisfied the Announcement's requirements and justified the waiver of penalties. Second, they maintain that the IRS failed to follow its own internal guidelines for determining whether penalty relief is warranted. (Doc. No. 103, pp. 16, 19.) Defendant responds that under the APA, this Court may not review either theory. The Court holds that it may review whether the disclosure complies with Announcement 2002 but may not review whether the IRS followed the appropriate procedures for reaching this determination.

### a.  Review of the Disclosure's Compliance with Announcement 2002

First, in accordance with <u>Port of Jacksonville</u>, this Court holds that Announcement 2002 consists of an agency-wide directive designed to confer important benefits to taxpayers who disclose their involvement in tax shelters such as FOCus. Announcement 2002 "encourage[s] taxpayers to disclose their tax treatment of tax shelters and other items for which the imposition of the accuracy-related penalty may be appropriate . . . ." (Doc. No. 103-5, p. 1.) In exchange for disclosure, the IRS "will waive the accuracy-related penalty . . . for any underpayment of tax attributable to that item." (<u>Id.</u>) As this case illustrates, the tax penalties are often substantial. By offering to waive the penalties, the Announcement does not establish policy and rules "governing internal agency operations or 'housekeeping' matters . . . ." <u>Capitol Fed. Sav. & Loan Ass'n & Subsidiary v. Comm'r</u>, 96 T.C. 204, 216 (1991) (citing <u>Sullivan v. United States</u>, 348 U.S. 170 (1954)). The purpose of the disclosure initiative is not to enumerate a series of general directives for the IRS to internally control or to dictate its tax assessment of tax shelters such as FOCus. <u>See</u> <u>Greenwood</u>, 764 F.2d at 1464 (declining to review agency

action under the Flood Control Act, which merely established "general directives to control the distribution of excess electricity" rather than "standards for eligibility for applicants for a government benefit"). Instead, by assuring that the IRS would waive penalties in exchange for a taxpayer's proper disclosure, the Announcement conferred an important benefit to qualifying individuals "in the face of otherwise unfettered discretion." Am. Farm Lines, 397 U.S. at 538-39.

Defendant argues that under Accardi, Plaintiffs may not seek judicial review of the IRS's denial of a substantive right—the waiver of the tax penalty—as opposed to a deprivation of a procedural right. They maintain that the Announcement does not provide for procedural safeguards such as a hearing or an administrative appeal associated with the penalty determination, whereas Accardi involved the denial of procedural relief associated with a substantive right, not the right to the substantive relief itself.

Defendant's interpretation is in accord with the explicit standard of Port of Jacksonville, 788 F.2d at 708, and its requirement that an agency action confer a "procedural benefit to a class to which complainant belongs."[2] However, it diverges from instances where courts have hinged the review of agency rules or regulations on whether they confer a benefit to the public, regardless of whether the benefit is procedural or substantive in nature. See, e.g., Ngure, 367 F.3d at 983 (observing that it did not have jurisdiction to evaluate a BIA decision involving regulations that "did not intend to create substantive rights for aliens"); Eli Lilly & Co. v. Comm'r, 856 F.2d 855, 865 (7th Cir. 1988) (noting that a "strong argument can be made that Revenue

---

[2]Defendant fails to cite to and this Court is unaware of any decision that has drawn this distinction.

Procedure 63-10 should be given binding effect" because it is "properly characterized as a substantive statement rather than a procedural directive"; the Revenue Procedure at issue provided guidelines for evaluating the transfers of intangible assets).

Here, however, the IRS allegedly failed to observe self-imposed limits upon the exercise of its discretion which invited reliance upon such limitations, in which case courts have held that judicial review is appropriate. See Estate of Shapiro v. Comm'r, 111 F.3d 1010, 1018 (2d Cir. 1997) (concluding that review of the IRS's compliance with the applicable Revenue Procedure was appropriate where the Commissioner had induced taxpayers to rely on the rule); LeCroy Research Sys. Corp. v. Comm'r, 751 F.2d 123, 127-28 (2d Cir. 1984) ("It is clear that there are judicially enforceable limits on the Commissioner's discretion to ignore prior assurances given to taxpayers . . . . An ongoing power to dishonor deliberately created expectations will deter private parties from seeking to take advantage of proffered tax benefits designed to encourage particular economic activity.").

On this point, the First Circuit's decision in United States v. Leahey, 434 F.2d 7 (1st Cir. 1970) is instructive. There, the court reviewed the IRS's failure to follow its own publicly announced directive requiring its special agents to give certain warnings on initial contacts with taxpayers subject to an investigation. Id. at 8-9. The court provided several justifications for its review. First, the announcement set forth a uniform rule of conduct by all agents that required judicial oversight, without which the IRS would have no great incentive to scrutinize or to carefully monitor the conduct of its agents. Id. at 10. Second, the court declared:

> When an agency "goes public" it does not do so lightly. Its obligations increase just as do those of a private corporation. This must be so since

11

> inquiry of personal subjective knowledge of a person affected by a procedural dereliction is no more practicable than in the securities field. There is no way of assuring that, once the public announcement has been made, some alert taxpayers or their lawyers have not relied on it.

Id. at 10-11. Third, the court distinguished the announcement at issue from an IRS procedure requiring, for example, that only trained agents interview suspects. In that scenario, where the agency relied on an accountant rather than an agent to conduct the interview, "[s]uch a deviation would not deprive the person interviewed of protection that was afforded to other taxpayers . . . . [T]he agency would gain no advantage from the selective unenforcement of its procedures, and the agency would have no disincentive to discipline the transgressing employee." Id. at 11.

United States v. Lockyer, 448 F.2d 417, 421 (10th Cir. 1971), provides a telling contrast. There, the Fifth Circuit held that an unpublished portion of the IRS handbook requiring revenue agents to suspend investigation upon discovering fraud did not apply to or define the rights of the taxpayer. Id. As the court explained, unlike Accardi or Leahey, the directive at issue was "that of internal administration. It is not a published provision and it does not purport to exist for the protection of the taxpayer's interests and rights." Id.

Here, the IRS issued a public directive designed to induce taxpayers to disclose their involvement in tax shelters in exchange for the waiver of penalties. The Agency stands to benefit from refusing to waive penalties despite a taxpayer's compliance with the Announcement. Further, the entire thrust of the Announcement is to provide a benefit to taxpayers, not to internally regulate the IRS's affairs. Thus without judicial oversight, taxpayers who relied to their detriment on the Announcement would be deprived of a penalty waiver otherwise available to other taxpayers. Irrespective of

whether Sarma is entitled to the protections of the Announcement, there is no doubt that he was prompted by the directive to make his disclosure and did so in reliance on the prospect of mitigating potential penalty obligations.

Finally, the Court's conclusion is buttressed by examining the Announcement itself. "As a general rule, an agency pronouncement is transformed into a binding norm if so intended by the agency and agency intent, in turn, is ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987). Defendant argues that Announcement 2002 evinces no intent by the IRS to limit its discretion and does not provide "judicially manageable standards" by which decisions to grant or deny a penalty waiver may be reviewed. Heckler v. Chaney, 470 U.S. 821, 830 (1985); Fla. Dep't of Bus. Regulation v. U.S. Dep't of Interior, 768 F.2d 1248, 1256-67 (11th Cir. 1985). However, the text and history of the Announcement lead the Court to a contrary conclusion.

Announcement 2002 begins by providing in no equivocal terms that "[i]f a taxpayer discloses any item in accordance with the provisions of this announcement before April 23, 2002, the IRS will waive the accuracy-related penalty . . . for any underpayment of tax attributable to that item." (Doc. No. 103-5, p. 1.) The use of *will* rather than *should* or *may* indicates an intent to be bound. Compare FPL Food, 671 F. Supp. at 1354 ("[T]he Directive does not say that agency officials should follow the procedures; it says that 'officials must follow the procedures.'"), with Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv., 677 F.3d 1073, 1084 (11th Cir. 2012) (holding that the statute's use of the word *may* "makes it all the more apparent that the decision at

issue is committed to agency discretion."). The IRS's intent to be bound is further evidenced by an internal memorandum issued by a Commissioner in the Department of Treasury reiterating that under the disclosure initiative, "the IRS is committed to waiving the accuracy related penalty . . . for all cases that otherwise qualify under the terms of Announcement 2002-2." (Doc. 103-7, p. 1.)

The Announcement also lists a series of specific procedural and substantive prerequisites to the eligibility of a penalty waiver. For example, the penalty must be attributable to one or more of the following: (1) negligence or disregard of rules or regulations; (2) any substantial understatement of income tax; (3) any substantial or gross valuation misstatement under chapter 1 of the Code; or (4) any substantial overstatement of pension liabilities. (Doc. No. 103-5, p. 1.) In addition, the taxpayer is required to disclose the tax item by a prescribed deadline and by a statement that describes, *inter alia*, the material facts, the taxpayer's tax treatment of the item, and the taxable years affected by the item. (Id. at 1-2.) Moreover, the taxpayer is required to submit the disclosure information to a specific entity and to the address of the Office of Tax Shelter Analysis ("OTSA"). (Id. at 2.) These substantive and procedural predicates provide the necessary "law to apply" when evaluating a taxpayer's eligibility for a penalty waiver. See FPL Food, 671 F. Supp. 2d 1354. And unlike Conservancy of Southwest Florida, this Court is able to determine whether the parties have complied with the Announcement and is familiar with the legal and factual issues involved—for example, whether Plaintiffs' disclosure supplies the material facts of the tax items in dispute, whether the statement describes the taxpayer's tax treatment of the item, and if the disclosed item is due to negligence, an understatement of income tax, or any gross

14

valuation. <u>See</u> <u>Conservancy of Sw. Fla.</u>, 677 F.3d at 1083 ("We have held before that the absence of any applicable legal standard that limits the agency's discretion precludes APA review.").

For these reasons, the Court holds that it may review whether the voluntary disclosure satisfied Announcement 2002's facial requirements.

### b. Review of the IRS's Compliance with Internal Procedures for Determining Penalty Relief

Plaintiffs also argue that a penalty waiver was warranted because the IRS failed to follow its procedures for imposing penalties in this case. Plaintiffs refer to a July 10, 2003 memorandum issued by Deborah Nolan, the Commissioner of the IRS's Large and Midsized Business Division, directing the examining agent to obtain approval of the Director of Field Operations ("DFO") to impose accuracy-related penalties. (Doc. 103, p. 8.) According to Plaintiffs, the IRS did not follow the memorandum because the Office of Chief Counsel, rather than the DFO, ultimately decided that the penalty relief was to be negated in this case. (<u>Id.</u> at 19.) Several considerations lead this Court to the conclusion that the IRS's internal procedure for approving penalties is not subject to judicial review and is distinguishable from the Agency's compliance with Announcement 2002.

Unlike Announcement 2002, the internal procedure at issue does not confer rights on the taxpayer. While the Announcement offers to waive penalties associated with the disclosure of a taxpayer's involvement in a tax shelter, the memorandum "falls into [the] class of nonbinding rules," <u>Capitol Fed. Sav.</u>, 96 T.C. at 217, which are "intended to aid in the internal administration of the IRS . . . ." <u>In re Wood</u>, 328 B.R. 880, 888 (Bankr. S.D. Fla. 2005); <u>see also</u> <u>Capitol Fed. Sav.</u>, 96 T.C. at 216 ("It is well

established, however, that general statements of policy and rules governing internal agency operations or 'housekeeping' matters, which do not have the force and effect of law, are not binding on the agency issuing them and do not create substantive rights in the public."). It is immaterial whether the DFO or the Office of the Chief Counsel negated the penalty waiver. Plaintiffs' rights in this case relate to whether a penalty was warranted, not to who made the final determination to assess the penalty.

Moreover, Plaintiffs do not allege that the Nolan memorandum was made public or that they relied on it to their detriment. Instead, the memorandum laid out a benign procedure for administering the disclosure process. The Agency's purported deviation from the procedure did not deprive Plaintiffs of a protection that was afforded to other taxpayers. It merely concerned the details of the Agency's audit process. See Leahey, 434 F.2d at 11 (holding that a deviation from a hypothetical rule requiring that only trained agents interview taxpayers "would not deprive the person interviewed of protection that was afforded to other taxpayers; his interview would not differ significantly from others except that his questioner would be less adept. Only the efficiency of I.R.S. operations would be harmed"); Lockyer, 448 F.2d at 421 (concluding that an unpublished portion of the IRS handbook requiring revenue agents to suspend investigation upon discovering fraud "does not purport to exist for the protection of the taxpayer's interests and rights; its manifest purpose is avoidance of encroachment and duplication and prevention of mistakes by the agent which could result in complicating prosecutions")

For these reasons, the Court holds that it may review whether Plaintiffs' disclosure warrants a penalty waiver under Announcement 2002, but it may not review

whether the Agency followed internal procedures requiring the DFO to make that determination. Defendant's Summary Judgment Motion is therefore granted in part and denied in part on these issues.

### 2. Does the Court Have Subject Matter Jurisdiction?

Defendant also challenges the Court's subject matter jurisdiction to determine whether the disclosure entitles Plaintiffs to penalty relief. In this TEFRA proceeding, the scope of the Court's jurisdiction is set forth in 26 U.S.C. § 6226(f):

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

The provision grants the Court jurisdiction to decide the applicability of a penalty relating to an adjustment of a partnership item.[3] TEFRA also permits the Court to evaluate partnership-level defenses to penalties during partnership-level proceedings. Klamath Strategic Invs. Fund ex rel. St. Croix Ventures v. United States, 568 F.3d 537, 548 (5th Cir. 2009). However, individual defenses on behalf of individual partners may only be resolved in a subsequent refund proceeding. See, e.g., 26 U.S.C. § 6230(c)(3)-(4) (authorizing a partner to bring suit to assert any "partner level defenses that may apply"). Under the applicable regulations, partner-level defenses are "those that are personal to the partner or are dependent upon the partner's separate return, and cannot be determined at the partnership level . . . ." Temp. Treas. Reg. § 301.6221-1T(d)

---

[3]"Partnership items" are circuitously defined as items that are "more appropriately determined at the partnership level than at the partner level." 26 U.S.C. § 6231(a)(3).

(1999).[4] In contrast, partnership-level defenses "include all defenses that require factual findings that are generally relevant to all partners or a class of partners and not unique to any particular partner." Tigers Eye Trading, LLC v. Comm'r, No. 14510-05, 2009 WL 1475159, at *19 (T.C. May 27, 2009).

Defendant argues that the Announcement 2002 disclosure is a partner-level defense to tax-related penalties that divests this Court of jurisdiction. Before evaluating this claim, the Court notes that in certain circumstances, defenses that are generally asserted at the partner level may be considered in partnership-level proceedings when the partnership itself offers the defense. A number of courts have recognized this exception, but only in the context of the reasonable cause and good faith defenses. For example, in Klamath, 568 F.3d at 537, the Fifth Circuit addressed the district court's jurisdiction to assess defenses to penalties associated with the Bond Linked Issue Premium Structure ("BLIPS") tax shelter. The Fifth Circuit held that the reasonable cause and good faith defenses may be considered at the partnership-level "if the defense[s] [are] presented on behalf of the partnership" and even though the applicable regulations suggest that they are generally partner-level defenses. Id. at 548; see also Stobie Creek Invs. LLC v. United States, 608 F.3d 1366, 1381 (Fed. Cir. 2010).

In applying this exception to this case, the Court is mindful of several issues. First, courts permit partnerships to raise the reasonable cause defense at partnership-

---

[4]The temporary regulations apply to all partnership years ending after August 5, 1997. The final regulations apply to all partnership taxable years beginning on or after October 4, 2001. Treasury Regulation § 301.6221-1. Here, the tax returns at issue concern the calendar year 2001 and are therefore governed by the Temporary Treasury Regulations. Nevertheless, in all relevant respects, both versions of the regulations are the same. Compare Temp. Treas. Reg. § 301.6221–1T(c)–(d) (1999), with Treas. Reg. § 301.6221-1(c)–(d) (2001).

level proceedings even though the applicable regulations identify the defense as one example of a partner-level determination. See Treas. Reg. § 301.6221–1(d); Klamath, 568 F.3d at 548. Here, there is no regulation suggesting that the disclosure is either a partner-level or partnership-level defense. In fact, the Announcement itself provides that a disclosure may be made on behalf of a corporate taxpayer, trust, state law partnership, or limited liability company. (Doc. No. 103-5, p. 2.) Thus, the justification for concluding that the disclosure may be filed on behalf of a partnership is stronger in this case. However, courts permit the reasonable cause and good faith defenses to be asserted on behalf of a partnership only when the partner asserting the defense is authorized to do so. See Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. 636, 703 (Fed. Cl. 2008) ("An exception to the exclusion of the reasonable cause and good faith defense from the partnership-level proceeding is recognized when the partnership itself offers the defense. In such instances, courts look to the actions of the partnership through its managing partner."), aff'd, 608 F.3d at 1381 (Fed. Cir. 2010) ("A reasonable-cause defense . . . may be a partner- or partnership-level defense, depending on who is asserting it . . . . We have jurisdiction because here the partnership (Stobie Creek) is claiming it had reasonable cause based on the actions of its managing partner, Jeffrey Welles.").

Thus, the Court's jurisdiction to evaluate the disclosure as a defense to accuracy-related penalties relies on two considerations: Sarma's authority to submit the disclosure on behalf of the FOCus partnerships and whether the disclosure indeed was filed on behalf of the partnerships. The Court is unable to decide the first issue on summary judgment, and therefore will not evaluate the second.

Announcement 2002 requires that "[t]he person signing [the disclosure] for a trust, a state law partnership, or a limited liability company must be, respectively, a trustee, general partner, or member-manager who has personal knowledge of the facts." (Doc. No. 103-5, p. 2.) Defendant offers several reasons why Sarma lacked the authority to submit the disclosure on behalf of the partnerships in accordance with the Announcement.

First, Defendant argues that the operating agreements of Nebraska and Lincoln preclude Sarma from filing the disclosure on behalf of the partnerships. Evaluating this claim is complicated by the fact that whereas Announcement 2002 requires a "member-manager" to submit a disclosure on behalf of a limited liability company, the operating agreements of Nebraska and Lincoln distinguish between the "Controlling Member" and the "Administrative Member."[5] (Id.; see also, e.g., Operating Agreement of Nebraska Partners Fund, Doc. No. 102-1, pp. 6, 8.) As the Controlling Member, Sarma could make or approve all "Major Decisions" for the partnerships. (Doc. No. 102-1, p. 9.) The agreements inclusively define "Major Decisions" to encompass a variety of tasks relating to approving or changing loans, investments, transactions, or assets of the company. (Id. at 9-10.) In contrast, as the Administrative Member, Bricolage Capital[6] was responsible for "the implementation of Major Decisions and the administration of the day-to-day affairs of the Company." (Id. at 11.) Defendant argues that the IRS disclosure falls within the broad authority conferred upon Bricolage Capital, not within Sarma's authority over the "Major Decisions" of the partnerships. Defendant also cites

---

[5]In all relevant respects, the Operating Agreements of Nebraska (Doc. No. 102-1) and Lincoln (Doc. No. 106-1) are the same.

[6] Bricolage Capital is a New York City-based hedge fund which owned 1% of both Nebraska and Lincoln.

20

to several instances where Bricolage Capital held itself out as the "Managing Member" of both Nebraska and Lincoln, while referring to Sarma as the "Non-Managing Member." (Doc. No. 101, pp. 5-6.)

The Court cannot resolve this issue based upon the record presented on summary judgment. The operating agreements are not nearly as clear as Defendant suggests. On the one hand, the agreements confer a broad range of responsibilities to Bricolage Capital which may include disclosing the partnerships' involvement in the straddle FX trades. For instance, Bricolage Capital was authorized to engage attorneys, accountants, consultants, or other service providers to prepare and file state and federal tax returns and other state filings for the Company, and "to do any other acts as [it] deems necessary in connection with the operation and management of the Company." (Doc. No. 102-1, pp. 12-13.) On the other hand, the agreements permit the Controlling Member (Sarma) to approve the partnerships' participation in "arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters," which could include the Announcement 2002 disclosure to the IRS for the purposes of avoiding tax penalties.[7] (Doc. No. 102-1, p. 11.) Accordingly, genuine issues remain over Sarma's authority to file the disclosure

---

[7]In light of this ambiguity in the operating agreements, Plaintiffs cite to a provision of Delaware law which sets forth that "[u]nless otherwise provided in a limited company agreement, the management of a limited liability company shall be vested in . . . the decision of members owning more than 50 percent" of the profits of the company. See Del. Code Ann. Tit. 6 § 18-402. Plaintiffs argue that Sarma, as the 99% owner of Nebraska and Lincoln, was authorized to file the disclosure on behalf of the partnerships. However, the operating agreements control, particularly because in Delaware, where the partnerships were incorporated, partners and LLC members have "the broadest possible discretion in drafting their [operating] agreements" and expect "that their partnership agreement will be enforced in accordance with its terms." Elf Atochem N. Am., Inc. v. Jaffari, 727 A.2d 286, 292-93 (D. Del. 1999).

on behalf of Lincoln and Nebraska.

With respect to Kearney, Defendant argues that at the time of the disclosure, Sarma could not have submitted the disclosure on its behalf because he lacked a direct or indirect interest in the partnership. (Doc. No. 101, p. 14.) It is undisputed that on December 19, 2001, Lincoln sold all of its interest in Kearney to a third party. (Id. at 4 (citing Doc. No. 102-5).) Sarma's attorney filed the disclosure with the IRS nearly four months later. (Doc. No. 105-19.) The Court agrees that once the sale occurred, Sarma and the remaining partners of Nebraska and Lincoln gave up their interests in Kearney and their authority to act on its behalf. However, the implication of this conclusion is less clear. At the very least, Sarma could not have filed the disclosure on Kearney's behalf and in accordance with Announcement 2002, which requires that a "member-manager" submit the disclosure. However, it is not entirely clear whether Sarma needed to file the disclosure on behalf of all three partnerships. Even though separate FPAAs were issued to each partnership, all three partnership tax adjustments derived from the same series of transactions. The IRS appears to have determined that accuracy-related penalties should be applied to the transactions as a whole, as opposed to each partnership individually. (See Doc. No. 1, pp. 24, 36.)

For these reasons, the Court holds that material issues remain concerning whether the Court has subject matter jurisdiction to assess whether Sarma's disclosure to the IRS is a partnership-level defense that may be evaluated in this partnership-level proceeding. Accordingly, Defendant's Summary Judgment Motion is denied as to this issue.[8]

_____

[8]Because the Court is unable to determine whether Sarma was authorized to

In sum, Plaintiffs have moved the Court to conclude that the voluntary disclosure satisfied Announcement 2002 and that the IRS failed to follow its own procedures in determining penalty relief. The Court declines to consider the first issue because it cannot, on summary judgment, determine the scope of the Court's subject matter jurisdiction and will not evaluate the second because it lacks the authority to do so under the APA.[9] The Court now turns to the parties' remaining arguments.

### 3. May Defendant Provide the Reasons for Denying Penalty Relief?

Defendant is alleged to have invoked a variety of privileges throughout discovery to avoid providing the reasons for denying penalty relief despite the Announcement 2002 disclosure. As a result, Plaintiffs assert that under the sword-and-shield doctrine, Defendant may not argue or introduce evidence of the penalty issue at trial or that an adverse inference should be drawn with respect to the penalty determination.

"Under the sword and shield doctrine, a party who raises a claim that will necessarily require proof by way of a privileged communication cannot insist that the communication is privileged." Allstate Ins. Co. v. Levesque, 263 F.R.D. 663, 667 (M.D. Fla. 2010); see also GAB Bus. Servs, Inc. v. Syndicate, 627, 809 F.2d 755, 762 (11th Cir. 1987). When an abuse has occurred under this doctrine, courts may invoke a

---

submit the disclosure on behalf of the partnerships, it will not evaluate whether the disclosure was indeed filed on behalf of the partnerships or on behalf of Sarma.

[9]In their Reply in support of their Summary Judgment Motion, Plaintiffs argue for the first time that Defendant indicated in its response that the IRS's official policy with respect to Announcement 2002 is contained within the express terms of the Announcement and the guidance given in the OTSA's published "Frequently Asked Questions" section. (Doc. No. 143, p. 8.) That section provides that the examiner or team manager, in conjunction with the OTSA, will review the disclosure and give the taxpayer a reasonable opportunity to correct any deficiency in its disclosure. Plaintiffs maintain that they were never afforded an opportunity to correct the alleged deficiencies. The Court declines to determine at this time on summary judgment its jurisdiction to assess this new argument or its merits.

variety of sanctions, including preventing the withholding party from unfairly prejudicing the other party by precluding the introduction of evidence previously withheld on privilege grounds, SEC v. Zimmerman, 854 F. Supp. 896, 899 (N.D. Ga. 1993), or ordering that the party's failure to produce the evidence gives rise to the presumption that the evidence is unfavorable. See Mikhlyn v. Bove, No. 08-CV-03367, 2011 WL 4529619, at *3 (E.D.N.Y. Aug. 3, 2011).

Plaintiffs aver that one of these two remedies is justified because until Defendant's Summary Judgment Motion, they were unaware of the basis behind the Agency's decision to impose penalties despite the voluntary disclosure. Defendant responds that during the depositions of its Rule 30(b)(6) representatives, Plaintiffs asked about the penalty relief, but only in the context of privileged documents or communications involving IRS attorneys Deborah Butler, Henry Schneiderman, and Leslie Spiegel. According to the IRS, had Plaintiffs asked the deponents to divulge the reasons for the penalty denial without referencing privileged communications, an answer would have been provided. To some extent, Defendant's characterization of the depositions is accurate. In the example provided by Plaintiffs' Reply, Plaintiffs ask the deponent to explain why penalty relief was denied. (Doc. No. 143, pp. 8-9.) But the line of questioning concerns the contents of a memorandum authored by the IRS local counsel Leslie Spiegel, for which attorney-client and deliberative process privileges were claimed.

However, Plaintiffs' interrogatories did precisely what the Government claims should have been done. They sought to elicit the reasons for denying penalty relief under Announcement 2002 without necessarily referencing privileged communications.

The IRS replies that while Plaintiffs filed a motion to compel the production of documents relating to the reasons for the IRS tax adjustments and the denial of penalty relief, they failed to move to compel a response to the interrogatories. Plaintiffs were under no obligation to do so, however, as Defendant is under a duty to supplement an incomplete response to a discovery request. Fed. R. Civ. P. 26(e). In short, this type of litigation "gotcha" strategy clogs courts with discovery motions. Both parties know quite well that Plaintiffs want to ascertain the reasons behind the denial of penalty relief with or without the document requests. Defendant relied on its privilege claims to obstruct Plaintiffs' discovery efforts.

Regardless, the Court finds that precluding Defendant from presenting any evidence relating to the reasons for the penalty waiver is not an appropriate remedy. Defendant agrees that it may not and will not offer into evidence a document it withheld on privilege grounds. (Doc. No. 131, p. 13.) In addition, the Court recently ordered Defendant to produce a legal opinion from the Office of Chief Counsel providing the reasons for denying accuracy-related penalties in this case. (Doc. No. 183.) At trial, and assuming the Court has subject matter jurisdiction, the parties will have an opportunity to establish whether the penalties were justified.[10] For these reasons, the Court denies

---

[10]To the extent that Plaintiffs argue that Defendant has unfairly withheld documents relating to the determination of tax obligations set forth in the FPAAs, the Court notes that in this TEFRA proceeding, it must conduct a de novo review of the FPAAs issued by the IRS. Under this standard, the Court will not look behind the FPAAs to examine the IRS's factual and legal basis in making tax adjustments. The rationale for this rule is "well settled." Gatlin v. Comm'r, 754 F.2d 921, 923 (11th Cir. 1985). In a de novo proceeding, the Court's determination of Plaintiffs' tax liability "must be based on the merits of the case and not any previous record developed at the administrative level." Id. Plaintiffs have previously argued that the Court should recognize an exception to this rule which operates to shift the burden from the taxpayer to the IRS when the FPAA or notice of deficiency is deemed to be arbitrary or excessive. (See Doc. No. 149,

Plaintiffs' Summary Judgment Motion on this issue.

### 4.  May Plaintiffs Allege a Disparate Treatment Claim?

Defendant argues that as a matter of law, Plaintiffs may not allege that the IRS is treating them disparately by denying penalty waivers that were provided to other taxpayers.[11] Plaintiffs respond that similarly situated taxpayers may not be treated differently without some rational basis for the difference.

The Eleventh Circuit has acknowledged that "equal treatment of taxpayers, although a worthy goal, is an inherently difficult task given the vast and complex administrative responsibilities imposed on the Commissioner" and has recognized that there are "limits on the equality principle" as applied to taxpayers. Baker v. United States, 748 F.2d 1465, 1469, n.9 (11th Cir. 1984). Other circuits have concurred that despite the laudable goal of consistency in tax treatment, "the IRS is not prohibited from treating such taxpayers disparately." Hostar Marine Transp. Sys., Inc. v. United States, 592 F.3d 202, 210 (1st Cir. 2010); Merck & Co., Inc. v. United States, 652 F.3d 475, 487 (3d Cir. 2011) ("Although it may seem unfair to require one taxpayer to pay a tax when another similarly-situated taxpayer has been able to avoid it, there are sound reasons that such disparate treatment is not ordinarily considered a defense to tax liability.").

---

p. 9.) However, courts recognize this limited exception where the case involves unreported income, not allegedly improper tax deductions as is the case here. See Sealy Power, Ltd. v. Comm'r, 46 F.3d 382, 386 (5th Cir. 1995); Gatlin, 754 F.2d at 923. However, with respect to the accuracy-related penalties in this case, there is no question that the IRS bears the "burden of production in any court proceeding with respect to liability for any penalty" imposed. See 26 U.S.C. § 7491(c).

[11]It is not clear whether Plaintiffs have alleged a separate claim for disparate treatment. In their Second Amended Complaint, Plaintiffs reference the IRS's "duty to apply administrative policies without discrimination" when discussing Defendant's decision to negate the penalty waiver with respect to the FOCus partnerships. (Doc. No. 52, p. 10.) Nevertheless, the Court will address this argument because it is limited to whether Plaintiffs can, as a matter of law, allege a disparate treatment claim.

Despite this cautious approach to allegations of disparate treatment of taxpayers, the Eleventh Circuit has declared that this circuit recognizes "a claim for administrative inconsistency." Powell v. United States, 945 F.2d 374, 377 (11th Cir. 1991). In Powell, the plaintiff alleged that the IRS was administratively inconsistent in refusing to treat his donations to the Church of Scientology as a tax deduction, while permitting members of other religious denominations to claim the same deductions. Id. In concluding that the plaintiff could seek relief from his claim for administrative inconsistency, id. at 377, the Eleventh Circuit cited to Justice Frankfurter's oft-cited concurrence in United States v. Kaiser, 363 U.S. 299, 308 (1960) (Frankfurter, J., concurring), declaring that "[t]he [IRS] Commissioner cannot tax one and not tax another without some rational basis for the difference." Defendant distinguishes Powell as a tax case alleging religious discrimination. However, Powell simply declared that a claim for administrative inconsistency becomes "more odious" when it is based upon religion, not that the claim is limited to that context. 945 F.2d at 377. As Powell noted, several other courts have recognized an administrative inconsistency claim in a variety of cases. Id. at 377 (citing Sharron Motor Lines, Inc. v. United States, 633 F.2d 1115, 1116 (5th Cir. 1981) ("As a federal agency, the ICC must act in an evenhanded manner in performing its regulatory duties."); N.L.R.B. v. Int'l Union of Operating Eng'rs, Local 925, 460 F.2d 589, 604 (5th Cir. 1972) ("[T]he Board may not depart sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case.")).[12]

Other courts similarly have taken a "historically . . . restrained and cautious

---

[12]Plaintiffs also rely on IBM Machines Corp. v. United States, 343 F.2d 914 (Ct. Cl. 1965), to support their disparate treatment allegations. However, courts have limited IBM to cases involving private agency rulings, which were at issue in IBM but not in the instant case. See, e.g., Merck, 652 F.3d at 487.

approach to alleged IRS administrative inconsistency," but have not precluded the claim altogether. Nationalist Movement v. Comm'r, 102 T.C. 558, 594-95 (1994), aff'd, 37 F.3d 216 (5th Cir. 1994); see also Baker v. Comm'r, 787 F.2d 637, 640 (D.C. Cir. 1986) (noting that the IRS conceded that "camp exclusion" for living in a hardship area cannot be denied to a taxpayer while accorded to his fellow employees); Sirbo Holdings, Inc. v. Comm'r, 476 F.2d 981, 987 (2d Cir. 1973) (concluding that the IRS cannot concede capital gains treatment to one taxpayer and deny it to another who received an identical payment). That said, it is well settled that "a taxpayer has no right to insist upon the same erroneous treatment afforded a similarly situated taxpayer in the past." Powell, 945 F.2d at 378. In other words, a taxpayer may not demand a refund because the IRS mistakenly afforded a similarly situated taxpayer the same erroneous tax benefit.[13]

Thus, while the Court acknowledges the limits on requiring the equal treatment of similarly situated taxpayers, it is bound to follow this Circuit's acknowledgement that a claim for administrative inconsistency exists. Aside from challenging this determination, Defendant offers no other reason to dismiss Plaintiffs' allegations. For these reasons, the Court denies Defendant's Summary Judgment Motion on this issue.

### 5. Was Defendant's Rule 30(b)(6) Witness Prepared?

Plaintiffs' final argument is that Defendants should be sanctioned because their Rule 30(b)(6) witness was unprepared for his deposition. On July 17, 2012, Plaintiffs deposed John Barker of the IRS's Office of Tax Shelter Analysis. In their subpoena,

---

[13]Few courts have thoroughly discussed the precise contours of an administrative inconsistency claim brought by a taxpayer. The parties cite to one such case, Bunce v. United States, 28 Fed. Cl. 500, 508-09 (1993), where the court divided the duty of administrative consistency into two: interpretive discretion and settlement discretion. For the purposes of this Motion, the Court declines to rule on whether this case controls or whether it falls under the interpretive discretion or settlement discretion category.

Plaintiffs requested that Defendant's representative be prepared to answer questions regarding Announcement 2002, namely about: (1) the preparation of the Announcement; (2) the qualifications required to satisfy the Announcement; (3) the IRS's processing of the disclosure under this Announcement by Pat Sarma; and (4) the number of timely disclosures received by the IRS and the number of denials by IRS of the relief granted under the Announcement. (Doc. No. 60-1.) On August 29, 2011, the Court denied (Doc. No. 64) Defendant's Motion for Protective Order (Doc. No. 60) seeking to prevent Plaintiffs from inquiring into Announcement 2002 on the basis that the Court lacked jurisdiction over the matter.[14] The Court reasoned that its jurisdiction was not at issue and that Plaintiffs' line of questioning concerning the Announcement was relevant and reasonably calculated to lead to the discovery of admissible evidence. (Doc. No. 64, p. 3.)

Plaintiffs allege that Mr. Barker was not prepared to answer questions regarding the number of timely disclosures received by the IRS pursuant to the Announcement and the number of denials of penalty relief granted through the process. Defendant responds that the information was not reasonably available and that even if it was retrievable, it would not be probative.

The IRS's relevance objection is not well-taken, as the Court has already rejected this same argument made in the Motion for a Protective Order. As to whether the data was retrievable, Defendant maintains that although the IRS retained a record of the disclosures, it did not keep a record of which disclosures resulted in a waiver of accuracy-related penalties. That information was allegedly very difficult to obtain

_____

[14]The Magistrate Judge's Order was affirmed by the District Court. (Doc. No. 97.)

because of complications surrounding the Agency's decision to approve or deny a penalty. (See Doc. No. 131-10.) For example, a taxpayer who submitted a disclosure may have been subject to a penalty for reasons outside of his compliance with Announcement 2002. In addition, a taxpayer could have been deemed to be subject to a penalty under Announcement 2002, but denied a penalty for some other reason, such as if he established good faith and reasonable cause for the underpayment of tax. (Id. at 3-5.)

In response, Plaintiffs aver that the IRS previously collected this information. They point to a previous survey conducted to ascertain the number of timely disclosures and the relief granted under Announcement 2002. Defendant states that the survey was conducted with respect to a specific subset of approximately 420 taxpayers who had submitted the Announcement 2002 disclosures. (Doc. No. 131-10, p. 4.) The Government maintains that the IRS employee conducted the survey by contacting the examining teams who handled the disclosures, and that the identities of many of the examination team members are no longer available. During his deposition, Mr. Barker admitted to failing to recall the details of the survey, but acknowledged that the Agency had deemed its results to be incomplete. (Doc. No. 131-1, p. 47.)

The Court holds that Mr. Barker's failures to recall that the survey was conducted and to procure a more comprehensive one are not sanctionable. Nevertheless, the Court will grant Plaintiffs' request to admit the survey into the record. For these reasons, the Court will deny in part and grant in part Plaintiffs' Summary Judgment on these issues.

**CONCLUSION**

It is hereby **ORDERED AND ADJUDGED** that:

1.      Defendant United States of America's Motion for Partial Summary Judgment and Supporting Memorandum of Law (Doc. No. 101) is **GRANTED IN PART AND DENIED IN PART**.

2.      Plaintiffs' Motion for Summary Judgment by Plaintiffs Regarding Announcement 2002 and Waiver of Penalties and Memorandum of Law in Support (Doc. No. 103) is **GRANTED IN PART AND DENIED IN PART**.

**DONE AND ORDERED** in Chambers in Fort Myers, Florida, on May 22nd 2013.


ROY B. DALTON JR.
United States District Judge



Copies:

Counsel of Record