**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

KEARNEY PARTNERS FUND, LLC;
NEBRASKA PARTNERS FUND, LLC;
and LINCOLN PARTNERS FUND, LLC,

        Plaintiffs,

v.                                                   Case No. 2:10-cv-153-FtM-37CM

UNITED STATES OF AMERICA,

        Defendant.

---

### MEMORANDUM OPINION AND ORDER

This cause is before the Court following an eight-day bench trial that concluded on September 25, 2013. (Docs. 246–52, 255.)[1] Having considered the pleadings, evidence, argument, and relevant legal authority, and having made determinations on the credibility of the witnesses, the Court hereby renders its decision on the merits of this case, pursuant to Federal Rule of Civil Procedure 52.

### BACKGROUND

These consolidated cases arise out of a tax dispute between the Internal Revenue Service ("IRS") and Plaintiffs, which are a three-tiered set of LLCs treated as partnerships for tax purposes (and which the Court will refer to herein as "partnerships"). (*See* Doc. 173-6, ¶ 1.) The IRS contends that the creation and operation of the partnerships constituted an illegal tax shelter. (Doc. 173, p. 9.)

Thus, the IRS issued Notices of Final Partnership Administrative Adjustments

---

[1] Documents 246 through 252 and Document 255 are Volumes I through VIII of the official trial transcript. For ease of reference, the Court will refer to Document 246 as "Tr. I" and so on.

("FPAA"), which adjusted the partnerships' tax returns to eliminate the tax consequences of the alleged shelter. (J-1 to J-11.)[2] The IRS' contention is that the partnerships' transactions lacked economic substance. (Doc. 173, pp. 10–11.) The IRS also determined that accuracy-related penalties should be imposed due to the alleged misstatements on the tax returns. (*Id.* at 10.)

Plaintiffs then filed these consolidated suits challenging the FPAAs. (*Id.*) Case Nos. 2:10-cv-154, -158, and -159 were brought for tax periods before December 4, 2001; at that time, the partnerships were formally owned by entities affiliated with a company called Bricolage. (*See id.* at 7–8.) Case Nos. 2:10-cv-153 and -157 were brought for tax periods after that date; at that time, Mr. Pat Sarma formally purchased the core partnership (Nebraska) and indirectly owned the other partnerships (Lincoln and Kearney). (*Id.*)

At trial, the facts revealed a complex series of transactions and interactions between Mr. Sarma, Bricolage, the partnerships, and other entities advising them. Based on the findings of fact explicitly laid out below and the record as a whole, the Court finds that Mr. Sarma and Bricolage, in conjunction with their advisors, schemed to create and operate the partnerships (even before Mr. Sarma formally purchased them) to serve as an abusive tax shelter; this allowed Mr. Sarma to avoid paying taxes on a large capital gain that he had incurred, in exchange for significant fees to Bricolage and the other advisors.

Though the facts are complicated, the law is less so: transactions are not entitled to tax respect if they lack any economic substance—either objective economic effects or

---

[2] "J" refers to Joint Exhibit; "P" refers to Plaintiffs' Exhibit; and "D" refers to Defendant's Exhibit.

a subjective business purpose. The Court therefore concludes that the IRS was correct to eliminate the tax consequences of the shelter's transactions, which had no economic substance whatsoever. However, the Court finds that the penalties are inapplicable due to an amnesty program propagated by the IRS in which Mr. Sarma participated on behalf of the partnerships.

## FINDINGS OF FACT[3]

### I.    Mr. Sarma

1.    Mr. Sarma is a well-educated, intelligent, and successful individual: He has an undergraduate degree in mechanical engineering and a graduate degree in operations research. (Tr. II, 187:11–25.) He is a sophisticated investor who has personally conducted some foreign exchange trading. (Tr. I, 89:5–7, 105:7–10.) In 2001, the time relevant to this case, his net worth was about $134 million. (J-110.)

2.    In the 1980s, Mr. Sarma, along with his business partner Mr. Shankar, founded a computer company called American Megatrends. (Tr. II, 190:18–191:10.)

3.    American Megatrends eventually became very well-known, and Mr. Shankar and Mr. Sarma sold one of its popular divisions in early 2001. (*Id.* at 193:5–194:13; Tr. III, 5:7–10.)

4.    An entity called KPMG was American Megatrends' accountant and advised the company on the accounting aspects of the division sale. (Tr. II, 203:3–6; Tr. III, 41:15–17.)

---

[3] The following facts have been established by a preponderance of credible evidence. To the extent that any of these facts may represent conclusions of law, the Court adopts them as such.

5.     Mr. Sarma was expected to receive a capital gain of approximately $80.9 million from the division sale, which would result in a tax obligation of about $16 million. (Tr. III, 5:7–10, 40:25–41:5; *see also* D-124.) Mr. Sarma received his first payment from the sale on September 1, 2001. (Tr. III, 5:7–10, 40:25–41:5.)

6.     Later that month, Mr. Sarma was hospitalized and underwent surgery. (Tr. II, 196:11–16.) He remained in the hospital until September 25, 2001. (*Id.* at 196:18–24; Tr. III, 42:12.)

7.     Around that time, Mr. Sarma decided to part ways with Mr. Shankar and to sell his American Megatrends stock. (Tr. II, 194:14–23, 200:18–201:2; Tr. III, 5:11–18.) He received a payment from that sale on December 1, 2001. (Tr. III, 6:22–25.)

## II.     Bricolage & KPMG

8.     Bricolage was created in 1999 to manage alternative investment strategies, such as hedge funds and funds-of-funds, for high net-worth individuals. (Tr. I, 73:2–7, 74:3–17, 85:19–22; J-97.) Bricolage worked with accounting firms, specifically KPMG, to get referrals to these individuals. (Tr. II, 92:1–5.)

9.     In September 2001, KPMG began identifying individuals who had recently had a "large liquidity event" as prospective Bricolage referrals. (*Id.* at 24:14–17, 92:24–93:1, 94:1–5, 95:22–24.) KPMG and Bricolage then marketed to its clients an investment vehicle known as a "Family Office Customized Partnership," or "FOCus." (*Id.*)

10.     KPMG was aware of Mr. Sarma's large capital gain due to its involvement

with the American Megatrends sale. (*Id.* at 203:3–6; Tr. III, 41:15–17.) Further, Mr. Sarma's banker First Union—which was also involved in FOCus—introduced him to Bricolage.[4] (Tr. II, 201:19–22; D-114; D-123.)

11.     Bricolage and KPMG structured the FOCus investment vehicle as a three-tiered set of partnerships akin to a "customized family fund of funds." (Tr. II, 47:2–6.)

12.     Through a complicated series of pre-planned steps, Bricolage and KPMG explicitly intended for FOCus to generate artificial tax losses for their high net-worth clients. (*Id.* at 94:13–17; D-26.) Those steps, encapsulated in Bricolage and KPMG PowerPoint presentations, match up almost perfectly with the facts as they unfolded in this case. (*See* D-26; D-124.) The following is a paraphrase of the steps (*see* D-124), which the Court will reference periodically throughout:

(1)     A corporation and a third party create an LLC to serve as a holding company.
(2)     They create a second LLC subsidiary to the first LLC.
(3)     They create a third LLC subsidiary to the second LLC which invests in hedging instruments. The third LLC recognizes gains and holds unrealized losses in equal amounts.
(4)     The investor buys the first LLC from the third party.
(5)     The investor agrees to contribute additional capital to the second LLC.
(6)     The investor buys the second LLC, yielding a suspended capital loss.
(7)     The second LLC borrows money to engage in currency option trading. The investor guarantees the loan.
(8)     The investor fulfills his agreement to contribute additional capital, increasing his tax basis in the second LLC.
(9)     The third LLC recognizes its previously unrealized losses from Step (3), which are passed through to the investor.
(10)    The second LLC terminates its currency option trading and the loan

---

[4] Like KPMG, *see infra* ¶ 39, First Union was paid a percentage based on the intended tax loss to be generated for Mr. Sarma. (D-49.)

guarantee. This results in a capital gain, which is offset by the suspended capital loss in Step (6).

(11)   The investor continues the investment program through the first and second LLCs for at least three years.

## III.   Creation of NLK

13.   In September 2001, Bricolage created ten FOCus investment vehicles based on the three-tiered structure described in Steps (1) through (3) above. *See supra* ¶ 12(1)–(3). Each FOCus vehicle had the name of a state as the core partnership with the name of two cities in the state as the lower-tier partnerships. (*See* Tr. II, 55:12–24, 63:9–23, 75:20.) One of those vehicles was the Nebraska/Lincoln/Kearney ("NLK") set of partnerships which are Plaintiffs in this case.[5] The structure of that three-tiered vehicle as a whole, referred to as the "NLK FOCus" or the "NLK partnerships," is described in detail below and then depicted in a graph.

14.   Nebraska Partners Fund was the top tier of the NLK partnerships, called the "core fund." (*Id.* at 48:11–16.) It functioned as a holding company. (*Id.* at 49:17–18.) Nebraska was capitalized and 99% owned by Pensacola PFI Corp., which was affiliated with Bricolage.[6] (*Id.* at 80:21–23.) Another

---

[5]   Another FOCus vehicle created by Bricolage at this time was the Nevada/Carson/Reno FOCus examined in *Nevada Partners Fund, LLC ex rel. Sapphire II, Inc. v. United States*, 714 F. Supp. 2d 598 (S.D. Miss. 2010), *aff'd in relevant part*, 720 F.3d 594 (5th Cir. 2013), *vacated on other grounds*, 134 S. Ct. 903 (2014) (citing *United States v. Woods*, 134 S. Ct. 557 (2013)). That court, the only one other than this Court to examine the FOCus investment structure, determined that it was an illegal tax shelter lacking in economic substance. *See* 714 F. Supp. 2d at 632–33. For further discussion of *Nevada* and a fuller explanation of its subsequent history, see *infra* note 24 and accompanying text.

[6]   Specifically, Pensacola was owned by ASA Trading, LLC and JJC Trading, LLC, which in turn were owned by Andrew Ahn and Jason Chai, respectively. (Tr. II, 48:23–24, 50:12–51:2.) Ahn was a trader working for Bricolage; Chai was related to one of Bricolage's founders. (*Id.* at 50:21–25, 51:5–17.) Bricolage fully controlled these

Bricolage entity called Bricolage Capital Management Company ("BCMC") owned the other 1% as the fund administrator. (*Id.* at 48:11–20, 52:6–16.) The creation of this partnership fulfilled Step (1) of Bricolage and KPMG's pre-planned steps. *See supra* ¶ 12(1).

15.   Lincoln Partners Fund was the middle tier of the NLK partnerships. (Tr. II, 49:1–4.) Nebraska owned 99% of Lincoln, and BCMC owned the other 1%. (*Id.*) The creation of this partnership fulfilled Step (2) of the pre-planned steps. *See supra* ¶ 12(2).

16.   Kearney Partners Fund was the bottom tier of the NLK partnerships. (Tr. II, 49:5–9.) Lincoln owned 99% of Kearney, while another Bricolage entity, Delta Currency Management Company ("DCMC"), owned the other 1%.[7] (*Id.*) Kearney's primary function was to conduct foreign exchange ("FX") trading. (*Id.* at 49:24–50:5.) The creation of this partnership fulfilled the first part of Step (3) of the pre-planned steps. *See supra* ¶ 12(3). Thus, the NLK partnerships at their creation were structured as follows:



---

entities; Ahn and Chai knew virtually nothing about them. (*See* Chai Dep. 25:22–26:3.)

[7] DCMC was owned by Caballo, Inc. and Stillwaters, Inc., which were owned by the founders of Bricolage. (Doc. 173-6, ¶¶ 4, 19.)

## IV.        Mr. Sarma Decides to Purchase NLK

17.     Once Bricolage created the NLK FOCus, the vehicle needed an investor; therefore, on behalf of its client Mr. Sarma, First Union set up a meeting for September 20, 2001, with KPMG, Bricolage, and Mr. Sarma's attorney.[8] (D-58.)

18.     At the meeting, KPMG presented all of the FOCus steps, *see supra* ¶ 12(1)–(11), which demonstrated that Mr. Sarma could offset his $80 million capital gain from American Megatrends with an artificial $80 million capital loss through the NLK FOCus, thereby relieving him of $16 million in taxes. (D-124.)

19.     The Court concludes that this meeting was the starting point for Mr. Sarma's involvement in the NLK FOCus. Though Mr. Sarma testified that he first became interested in buying the Nebraska partnership in late November 2001 (Tr. II, 66:22–67:2; Tr. III, 6:8–13), the Court simply does not find that testimony credible in light of the September 20 meeting as well as the reasons stated below.

20.     An internal KPMG email revealed that Mr. Sarma decided to proceed with a FOCus investment on October 16, 2001. (Tr. II, 148:12–24; D-97.) Bricolage capitalized the NLK FOCus and Kearney began trading within days of that email. (Tr. II, 149:25–150:5; Doc. 197-7, ¶¶ 24–28.)

21.     Additionally, Mr. Sarma's testimony on his knowledge of the partnerships before he purchased them was unpersuasive. Mr. Sarma testified first that

---

[8] Mr. Sarma was still in the hospital recovering from surgery at this point. (Tr. II, 196:18–24; Tr. III, 42:12.) However, his wife and son attended the meeting along with his attorney. (D-58; D-125.)

he was aware that Kearney was conducting trading in late October and early November 2001; he then backtracked and claimed that he was unaware. (Tr. II, 208:17–20, 211:5–10.) The Court does not find Mr. Sarma's assertions that he was unaware that Kearney was conducting trading before he formally bought Nebraska to be credible, as his testimony was internally contradictory.

22.   This evidence, taken together, leads the Court to conclude that Mr. Sarma actually decided to buy the NLK FOCus on October 16, 2001, which put the tax shelter into motion. This finding is corroborated by the timing of the capitalization of the partnerships and the Kearney FX trades.

## V.   Kearney FX Trades

23.   On October 19, 2001, with Mr. Sarma's go-ahead but with the partnerships still nominally owned in large part by Pensacola, *see supra* ¶ 16 Graph, Kearney began conducting FX trades through Credit Suisse First Boston ("CSFB"). (J-80.)

24.   Generally, FX forward trades involve the agreement simultaneously to buy one currency and to sell another at some future date at a current agreed-upon price. (Tr. IV, 103:17–24.)

25.   Specifically, CSFB would agree to buy a certain amount in U.S. dollars (called a "notional" amount) from Kearney and, at the same time, to sell the equivalent amount in a foreign currency to Kearney, with the forward set for a value date several months in the future. (J-80.) Then, CSFB would agree to sell the U.S. dollars and to buy the foreign currency back (the reverse of the first transaction), at a slightly different notional amount

and a value date of about two months further ahead. (*Id.*) This pair of transactions is called a "straddle," with each transaction called a "leg."[9] (*See* Tr. IV, 103:12–15.)

26.　　The Kearney straddles as a whole worked as follows: Each of the packages began with one short and one long leg, as described above. (*Id.* at 157:13–16.) Within the next day or two, whichever leg ended up with a gain was canceled (or "cash settled"), realizing that gain. (*Id.* at 159:11–24; Tr. V, 203:5–16.) CSFB then used the gain to offset the losing leg. (Tr. IV, 160:3–5; Gluck Dep. 102:2–13; Doc. 173-6, ¶ 40.) Unlike the gain leg, the loss leg was left outstanding, with the loss to be locked in at a future point. (Tr. V, 203:17–23.)

27.　　The Court finds that the trades were designed and conducted to limit any real economic risk—and thus any potential of meaningful profit—to Kearney. The Court is not persuaded otherwise by Plaintiffs' experts.[10]

28.　　Plaintiffs' expert Mr. Howard Carr, an FX trader, opined that there were two major risks inherent in the Kearney trades: (1) the "spot risk" created by the different notional amounts of the two trades in each straddle; and

---

[9]　The trades were put on and taken off at the same time. (Gluck Dep. 103:14–19.)

[10]　The Court is unconvinced by Plaintiffs' expert Dr. Jack Yeager, an econometrics consultant, who quantified Kearney's potential for profit at 71%. (Tr. IV, 28:13–23.) First, the potential was assumed over the course of one year, which is essentially irrelevant to the Court's analysis of this specific, short-term timeframe. (*See id.*) Second, Dr. Yeager's opinions were heavily based on those of Mr. Michael De Laval, who is Dr. Yeager's partner in a consulting enterprise (*id.* at 13:21–14:16, 20:17–24); as noted below, *see infra* ¶¶ 41–44, the Court does not find Mr. De Laval's opinions to be persuasive. Third, Dr. Yeager is not an FX trader, and these trades are highly industry-specific, such that the context matters, not merely the numbers. Finally, Dr. Yeager was unduly intractable during his cross-examination to a point that undermined his credibility. (*See* Tr. IV, 77:18–78:8.)

(2) the "forward risk" created by the two-month gap between the value dates. (Tr. IV, 106:1–7, 108:13–17.)

29.     However, Defendant's expert Dr. Timothy Weithers, a professor of mathematical economics with significant experience teaching FX trading to FX traders, persuasively explained that the opposite was true: the combination of the different notional amounts and value dates actually *limited* risk. (Tr. V, 171:20–173:10, 178:7–180:16, 182:22–183:15, 219:10–17.) More particularly, the traders used the interplay of the different value dates combined with the anticipated changes in the paired currencies' interest rates in the months leading up to those value dates to essentially hedge backwards and choose two different notional values with a *roughly equal present value.* (*Id.* at 219:24–223:10.) The Court finds this to be the only logical, persuasive explanation for the peculiar permutations of notional amounts and value dates used in these trades.

30.     Crucially, this reverse-engineered structure allowed the traders to conduct the trades so as to end up with virtually equal gains and losses, with the gains cash-settled and the losses locked in for future realization by Mr. Sarma. (Caderas Dep. 104:25–105:3, 156:22–157:2; Gluck Dep. 102:2–13.) This structure comports with the second part of Step (3) of Bricolage's pre-planned steps, which mandated that the third-tier partnership would recognize gains and hold unrealized losses in equal amounts. *See supra* ¶ 12(3).

31.     The Court's finding that the trades were designed to limit any risk to Kearney is supported by the statements of the individuals who conducted

the trades for CSFB. (D-5; Caderas Dep. 165:15–166:2.)

32.    This finding is further supported by the fact that all seventy-three of the trades conducted during this period, with comparatively huge losses and gains, only ended up with a total net gain of $893.05.[11] (Tr. VI, 24:2; *see also* Caderas Dep. 166:18.)

33.    Additionally, the expert testimony established that it is nigh impossible to have both legs on these straddles make a profit—even Plaintiffs' expert Mr. Carr admitted as much. (Tr. IV, 168:7–12; Tr. VI, 9:10–10:2, 11:1–10.) This testimony was corroborated by the fact that in all of the Kearney trades, there were no instances in which both legs made a profit. (Tr. VI, 11:8–10.) Accordingly, it makes no sense for CSFB to have structured the straddle trades in the way that it did if it was truly trying to create a profit for Kearney.[12]

34.    For tax purposes, the realized gains from the FX trades then passed through to the Bricolage-affiliated entities.[13] (J-47; J-49; J-52; D-1; D-2;

---

[11] This figure was confirmed by the Court's own simple arithmetic (present value less deposit total). (J-80.)

[12] The Court also does not believe Plaintiffs' expert testimony that the possibility of interest earned on the deposits could have made a profit for Kearney. (Tr. V, 9:12–10:12.) Dr. Weithers convincingly explained that although interest would accrue on the trades that were left open, it was owed to CSFB to pay off Kearney's locked-in loss. (Tr. VI, 29:2–8, 29:16–22.)

[13] Pensacola had distributed its 99% interest in Nebraska to its owners, ASA and JJC, which in turn were owned by Ahn and Chai, *see supra* note 6. (Doc. 173-6, ¶ 8.) The distribution triggered the obligation to file a short-year tax return. *See* 26 C.F.R. § 1.708-1(b)(3)(ii). Kearney reported a gain of $79.1 million from the FX trades; Lincoln reported a flow-through gain of $78.3 million from its interest in Kearney; and Nebraska reported a flow-through gain of $77.6 million from its interest in Lincoln. (J-47; J-49; J-52.) Ahn and Chai reported those flow-through gains on their individual tax returns, but offset the gains via purported mark-to-market elections (which are typically used by traders). (D-2; D-3.) Ahn and Chai never actually benefited from the gains or received

D-3.) The losses remained locked in to Kearney for future realization by Mr. Sarma. (Caderas Dep. 104:25–105:3, 156:22–157:2; Gluck Dep. 102:2–13.)

## VI.   Formal Purchase of Nebraska & Strategic Consulting Agreement

35.   With Kearney's gains safely realized and his payment from American Megatrends in hand, Mr. Sarma formally bought Nebraska on December 4, 2001, for approximately $3.8 million. (Tr. II, 69:10–13, 71:1.) This comports with Bricolage's Step (4). *See supra* ¶ 12(4); *see also supra* ¶ 16 Graph (substituting Mr. Sarma for Pensacola).

36.   That same day, Bricolage and Mr. Sarma executed a Strategic Consulting Agreement, through which Mr. Sarma officially engaged Bricolage's services. (J-13.) Bricolage charged Mr. Sarma a one-time Strategic Consulting Fee of $4,262,000 for its services.[14] (Tr. I, 132:22–133:9.)

37.   Bricolage contends that the frontloading of that fee encouraged clients to remain with Bricolage even after its initial recommendations. (*Id.* at 134:12–17.) However, Mr. Sarma paid the fee upfront despite the fact that either party had the contractual right to terminate the relationship on

---

any payout; essentially, the gains were washed away through the manipulation of the tax system. (*See* Chai Dep. 34:25–35:18.) For example, Chai reported over $1 billion in both gains (flow-throughs from various S-corporations, including Pensacola) and losses (from other property); despite all this, he actually had a negative adjusted gross income and received a $21,000 tax refund. (D-2.)

[14] Bricolage and Mr. Sarma also negotiated a put agreement through which Mr. Sarma could back out of their arrangement for a $420,000 fee if he changed his mind. (J-112.) This penalty would have been unnecessary if Mr. Sarma had simply waited and considered the transactions more fully. Essentially, the necessity of creating an expensive out from a rushed arrangement does not make any economic sense; it only makes sense when viewed through a tax-motivated lens, as Mr. Sarma had to conduct the transactions quickly before the end of the year to get rid of his capital gain. (*See* Tr. VII, 5:12–23.)

ten days' notice. (Tr. III, 60:1–62:12; J-13.) This undermines the assertion that the fee was somehow earned over time by Bricolage's good performance.[15]

38. Tellingly, when asked whether he paid the Strategic Consulting Fee based on the intended tax loss, Mr. Sarma replied, "Not really." (Tr. II, 219:7–9.) The Court does not find this testimony credible for the following reasons.

39. Bricolage sent Mr. Sarma's attorney an email detailing precisely how the Strategic Consulting Fee was calculated. (D-75.) The calculation began with the number $77.6 million—not coincidentally, the exact amount of capital loss that Mr. Sarma intended to and did receive through FOCus. (*See* Tr. II, 123:12–15.) 7.25% of that $77.6 million is $5,626,000.[16] (D-75.) Subtract from that figure $388,000 for the potential loss inherent in the Lincoln yen carry trade (0.5% of the $77.6 million loss), $776,000 for KPMG's referral fee (1% of the loss), and $200,000 for Arnold & Porter for two tax opinion letters,[17] and one ends up with $4,262,000—the amount of Bricolage's Strategic Consulting Fee.[18] (*Id.*; Tr. II, 123:2–124:16.)

40. To suggest that Bricolage was not paid for the amount of tax loss that Mr. Sarma incurred in the face of these figures, which are explicitly calculated from the starting point of the intended loss, simply defies

---

[15] The parties' agreement even explicitly provided that it did "not include on-going investment advisory services or advice." (J-13.)

[16] 7.25% in fees was planned from the beginning of the scheme. (D-123; D-147.)

[17] These opinions appear to be largely form letters drafted earlier for a similar tax shelter called POPS. (J-109; J-113; J-114; J-126; D-27; D-93; D-106; D-131; D-252; D-258; D-274.)

[18] CSFB was also paid based on the tax loss, a fact that, significantly, made CSFB's people "jittery." (D-33; *see also* D-15; D-108.)

credulity.

41.   The Court is not convinced otherwise by Plaintiffs' fees expert Mr. Michael De Laval, a trading consultant. (Tr. III, 109:4–6, 114:22–24.) The Court did not find Mr. De Laval to be a credible witness for several reasons.

42.   First, Mr. De Laval admitted that he was not sure how Bricolage calculated the $4.2 million fee, including whether it took into account predicted future performance fees. (Tr. V, 159:13–160:6.) As noted above, *see supra* ¶ 37, the Court finds the frontloading of the fee coupled with the parties' right of immediate termination to belie the notion that the fee was somehow a compiled long-term performance fee.

43.   Further, when asked whether the frontloaded fee structure was "common," Mr. De Laval replied, "Look, the—'common' is a difficult word, because I don't see the entire world, right? Have I heard of transactions negotiated that had a front end load to them? Absolutely I have." (Tr. III, 135:23–136:1.) Yet, Mr. De Laval had difficulty identifying any other funds-of-funds that used such frontloaded fees. (*Id.* at 168:20–171:10.) Indeed, the Barclay hedge fund database from which Mr. De Laval drew the figures on which his opinion relied does not even have any information regarding frontloaded fees, suggesting that they are rather uncommon.[19] (*Id.* at 168:8–19.)

44.   Finally, Mr. De Laval stated that the reasonableness of an amount of fees is dependent on the amount of assets under management. (*Id.*

---

[19] Indeed, the Barclay hedge fund database's average fees were calculated as "earned over time"—the opposite of the Strategic Consulting Fee. (Tr. III, 189:14–17.)

at 175:16–21.) However, this statement undermines Mr. De Laval's opinion that the fees here were reasonable in light of his past opinions. In the comparable *Nevada* FOCus case in which Mr. De Laval also testified, *see supra* note 5, the assets under management totaled $114 million, but the investor paid just $845,000 in fees. (*Id.* at 175:13–25.) Here, the assets under management were assumed (by Mr. De Laval's analysis) to be $100 million, but Mr. Sarma paid $4.2 million in fees—more than four times as much, even though the assets under management were at least $14 million less. (*Id.* at 175:13–176:14.) Despite this disparity, Mr. De Laval continued to insist that Mr. Sarma's fees were reasonable. (*Id.* at 176:17–22 ("At the end of the day, when I did the analysis, the way I explained the analysis, right, going through all the different metrics, it still came out to be reasonable in terms of comparison. I'm not saying that Mr. Sarma got as good of a deal as [the investor in the *Nevada* FOCus case]. That's what negotiation is all about, isn't it?").) The Court did not find Mr. De Laval's opinions on this point to be credible.

45.   Thus, the Court finds that the Strategic Consulting Fee was not reasonable or based on Bricolage's expected long-term performance. Rather, it was plainly tax-motivated and based solely on Mr. Sarma's intended capital loss to be generated through the NLK FOCus. In essence, the fees that Mr. Sarma paid were the purchase price for the tax shelter.

## VII.   Formal Purchase of Lincoln & Yen Carry Trade

46.   On December 17, 2001, with the assistance of a bridge loan to secure

enough financing, Mr. Sarma formally bought Lincoln from Nebraska for $2.3 million (J-105). *See supra* ¶ 16 Graph (substituting Mr. Sarma as the 99% owner of Lincoln).

47.     Mr. Sarma testified that he bought Lincoln to save on duplicative fees. (Tr. II, 222:2–6.) The Court does not find this testimony credible. First, Mr. Sarma already owned 99% of Lincoln through Nebraska, so he was essentially buying Lincoln from himself. Further, Bricolage had previously waived other fees for Mr. Sarma (*id.* at 72:21–73:10), so it is implausible that some other arrangement could not be worked out besides the contribution of millions of dollars in capital that needed to be partially financed with a loan (D-74). (*See* Tr. VII, 9:2–20 (Defendant's expert testimony that the bridge loan had no economic rationale).) Rather, the Court finds instead that the purchase was intended to trigger a "suspended" capital loss (*see* D-124; D-125), which would offset the gain that Mr. Sarma would incur when he was released from his guarantee of the yen carry trade, which is discussed further below, *see infra* ¶ 63. *See* 26 U.S.C. §§ 267(d), 707(b)(1). The purchase of Lincoln and the suspended capital loss match Step (6) of the Bricolage/KPMG PowerPoint. *See supra* ¶ 12(6).

48.     Once Mr. Sarma bought Lincoln, Bricolage proposed that Lincoln engage in a yen carry trade. (Tr. V, 65:1–19, 66:17–23, 78:19–22.) Bricolage contends that the trade was intended to take advantage of recent Japanese policies that were expected to weaken the yen against the U.S. dollar. (*Id.*) The Court does not find that contention persuasive for the

reasons below.

49.     The trade was set up as follows: Lincoln borrowed approximately 5 million yen from CSFB at an interest rate of less than 1%, converted the money to U.S. dollars (about $38.8 million), and used it to buy a deep-in-the-money call spread.[20] (*Id.* at 66:17–23; Tr. VI, 31:25–19.) The strategy was bullish, and the value of the spread would increase if the market went up as expected. (Tr. V, 78:19–22.)

50.     At the time, the current price of the yen was 128 against the dollar. (*Id.* at 73:4–11.) The options purchased by the call spread gave Lincoln the right to buy the yen at 57.46 and at 50 against the dollar. (*Id.*; Tr. VI, 32:8–16.) These options were very valuable (which is why they cost $38.8 million), particularly because it was highly unlikely that the price would actually drop from 128 all the way down to 50 during the span of the options. (Tr. VI, 31:8–32:19.)

51.     Importantly, though, CSFB also put a collar on the spread; a collar is a combination of options "typically [used] to eliminate risk in one direction." (*Id.* at 33:20–24.) It involves selling an out-of-the-money call and buying an out-of-the-money put. (Tr. V, 76:4–77:20.)

52.     Essentially, the collar severely limited both risk and reward. (Tr. VI, 34:9–15.) The collar was used to hedge just in case the yen unexpectedly strengthened, rather than weakened, against the dollar. (Tr. V, 75:3–7; Tr. VI, 35:4–10.)

---

[20] A deep-in-the-money call is where the strike price of the option is far below the current price of the asset. (Tr. V, 73:4–11.) By contrast, an out-of-the-money call is where the strike price is higher than the current price. (*Id.* at 76:16–21, 77:6–20.)

53.   However, the yen did actually weaken against the dollar as expected, and Lincoln ultimately made about $200,000 on the trade. (Tr. V, 79:8–14; Tr. VI, 37:13–20.)

54.   Given the bullish investment thesis, the Court is logically persuaded by Dr. Weithers' opinion that it did not make sense for Lincoln to limit its potential gain with the collar. (Tr. VI, 38:3–5.)

55.   The Court is unpersuaded by Plaintiffs' expert Mr. Emory Todd Deiterich, an FX trader, who opined that Lincoln had a possibility of making $1.2 million from the trade. (Tr. V, 96:2–5.) Rather, the Court is convinced by Dr. Weithers' calculations that, with the collar in place, both the potential profit and the potential loss to Lincoln were limited to between $300,000 and $400,000. (Tr. VI, 36:10–21.) This is corroborated by Lincoln's actual profit, which was below that range. (*Id.* at 37:13–20.) These numbers are further supported by the calculation of the Strategic Consulting Fee, which included $388,000 for "FX Risk"—a number squarely within Dr. Weithers' calculated range. (D-75.)

56.   Thus, the Court concludes that the yen carry trade must have been conducted for reasons other than to make Lincoln a meaningful profit—specifically, to create the illusion of profit potential and the opportunity for Mr. Sarma to guarantee the loan from CSFB, as discussed below.

## VIII.   Guarantee

57.   Mr. Sarma testified that CSFB required him to personally guarantee the Lincoln yen carry trade loan for $38.8 million. (Tr. III, 26:14–17 ("Well, the prospects for profit were here and—I don't know. I mean, if they—I don't

think I could have conducted this transaction without guaranteeing the loan."), 73:15–18; *see also* Tr. II, 162:19–22.) Further, Plaintiffs' expert testified that Mr. Sarma was actually exposed to the potential for losing all $38.8 million in connection with the guarantee. (Tr. IV, 36:4–6.) The Court does not find this testimony credible for the following reasons.

58.   First, the potential risk and reward of the trade was around $300,000. (Tr. III, 72:24–11; Tr. VI, 36:10–21.) Yet, Mr. Sarma personally guaranteed the investment for a relatively huge figure ($38.8 million). (Tr. III, 73:15–18.) This makes little economic sense, and indeed, Dr. Weithers opined that the guarantee had no economic merit. (Tr. VI, 39:11–13.)

59.   More importantly, CSFB simply *did not* require the guarantee.[21] (Gluck Dep. 151:1–3.) Rather, Bricolage offered the guarantee to CSFB. (*Id.* at 151:4–7.) In fact, CSFB did not require a guarantee because it was not taking on any risk. (D-236.)

60.   Thus, the only logical reason for the guarantee was to increase Mr. Sarma's tax basis in Lincoln to prepare to realize the Kearney losses. *See* 26 U.S.C. § 465(b). This finding is supported by Bricolage's own stated intentions. (D-26 ("The clients will guarantee liabilities of the investment partnership to create sufficient tax basis to recognize such losses without any limit, and the losses will be triggered and allocated to the clients.").) The loan and guarantee match Step (7) of the Bricolage/KPMG PowerPoint. *See supra* ¶ 12(7).

---

[21] Additionally, the guarantee was not listed on the index of documents relating to the yen carry trade loan. (Tr. II, 163:7–20; J-85.)

61.    In addition to the guarantee, Mr. Sarma also contributed $36.5 million in capital to Lincoln. (D-80; D-82; J-108.) This comports with Steps (5) and (8) of the PowerPoint. *See supra* ¶ 12(5), (8).

62.    The $38.8 million guarantee plus the $2.3 million purchase price and the $36.5 million capital contribution equals $77.6 million worth of tax basis in Lincoln—the precise amount of loss that Mr. Sarma needed to realize through Kearney. *See* 26 U.S.C. § 705(a)(1). The exactitude of these numbers simply cannot be mere coincidence.

63.    Furthermore, when the yen carry trade later concluded in early 2002, CSFB released Mr. Sarma from the guarantee, resulting in a technical $38.8 million "gain," *see* 26 U.S.C. § 752(b). (J-116.) This "gain" was offset the following year by the suspended loss that Mr. Sarma received when he purchased Lincoln. *See supra* ¶ 47. This matches Step (10) of the Bricolage/KPMG PowerPoint. *See supra* ¶ 12(10).

## IX.    Sale of Kearney & Realization of Loss

64.    On December 19, 2001, Mr. Sarma sold Kearney to a Bricolage-related entity called Fermium II Partners Fund, LLC[22] and realized the locked-in losses from the FX trades. (Doc. 173-6, ¶ 63; D-177.) This matches Step (9) of the PowerPoint. *See supra* ¶ 12(9); *see also supra* ¶ 16 Graph (substituting Fermium as the 99% owner of Kearney).

65.    Mr. Sarma ultimately realized a $77.6 million loss through Lincoln from the Kearney FX trades—precisely the amount of the capital gains that he

---

[22] Fermium, like DCMC, was owned by Caballo and Stillwaters, which were owned by the founders of Bricolage, *see supra* note 7. (Doc. 173-6, ¶¶ 64–65.)

sought to offset through FOCus and precisely the amount of the tax basis that he had engineered in Lincoln through the guarantee and his capital contribution. (D-36; D-63; D-81.)

66.    Mr. Sarma continued to have a relationship with Bricolage through at least 2005 and eventually made money off of the partnerships' later bona fide transactions. (Tr. II, 214:17–21; P-59.) This, too, was a pre-planned step in the FOCus shelter. (D-124 ("Participation in program expected to last not less than three years.").) It matches Step (11) of the Bricolage/KPMG PowerPoint. *See supra* ¶ 12(11).

## X.    Announcement 2002-2

67.    In early 2002, the IRS released Announcement 2002-2, an amnesty provision which provided that if a taxpayer properly disclosed his involvement in a tax shelter, the IRS would waive certain accuracy-related penalties. (P-67.)

68.    Once Bricolage became aware of the Announcement, it discussed the Announcement with Mr. Sarma's attorney. (Tr. II, 87:2–4, 88:17–90:2.) Mr. Sarma therefore decided to make a disclosure of his involvement in the NLK FOCus pursuant to the Announcement. (*Id.*; Tr. III, 28:19–29:3.) The disclosure was prepared jointly by Mr. Sarma's attorney, Bricolage, and KPMG. (Tr. III, 29:4–30:1.)

69.    Mr. Sarma then filed the disclosure, which stated his connection with Bricolage and his purchase of Nebraska and Lincoln. (P-68.) The disclosure was signed by Mr. Sarma and his wife. (*Id.*)

70.    Bricolage consented to the disclosure. (Tr. II, 90:5–12.) The Court is

persuaded that Mr. Sarma believed that he was filing the disclosure on behalf of the partnerships and that he had the authority to do so because he was the controlling member. (Tr. III, 32:18–33:12.)

71. The IRS subsequently confirmed that the disclosure met the requirements of the Announcement. (P-69.) Nevertheless, it imposed penalties anyway. (*See* J-1 to J-11.)

## XI.   Summary of Findings

72. Mr. Sarma decided to buy the NLK FOCus in mid-October 2001, which galvanized the Kearney FX trades. *See supra* ¶ 22.

73. With Mr. Sarma's knowledge, Bricolage designed and conducted the Kearney FX trades so as to limit any real risk (and therefore any real profit) to Kearney. The trades generated large artificial gains and losses, but only a de minimis actual profit. *See supra* ¶¶ 27–33.

74. When Mr. Sarma bought Nebraska, the losses from the Kearney FX trades were still locked in and unrealized. *See supra* ¶ 34.

75. When Mr. Sarma bought Lincoln from Nebraska, guaranteed Lincoln's yen carry trade loan, and made a large capital contribution to Lincoln, these actions served no economic purpose and were done solely to increase Mr. Sarma's tax basis in Lincoln. *See supra* ¶¶ 56, 60–62.

76. Once Kearney was sold, the losses were realized to Mr. Sarma. He was able to claim all of those losses due to his increased tax basis in Lincoln; the amount of the tax basis and the amount of the loss claimed mirrored each other. *See supra* ¶¶ 64–65.

77. These steps comport virtually perfectly with Bricolage and KPMG's

PowerPoint presentations describing FOCus as a "tax motivated transaction" (D-26; D-124). *See supra* ¶ 12.

## CONCLUSIONS OF LAW[23]

### I.   Jurisdiction

The Court has jurisdiction over this partnership-level action. *See* 26 U.S.C. § 6226. Pursuant to this jurisdiction, the Court may:

> determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

*Id.* § 6226(f).

### II.   Burden of Proof

The IRS' tax determinations are presumed to be correct. *Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 386 (5th Cir. 1995). The taxpayer then takes on the burden of proving by a preponderance of the evidence that the IRS' determination was incorrect. *Id.* If the taxpayer does so, the burden shifts back to the IRS to prove otherwise. *Id.*

### III.   Economic Substance

#### A.   Standards

"The fact that favorable tax consequences were taken into account by [the taxpayer] on entering into [a] transaction is no reason for disallowing those consequences." *Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978). However, tax-avoidance is not permitted to be the taxpayer's only motive for entering the transaction. *See Gregory v. Helvering*, 293 U.S. 465, 469 (1935).

---

[23] To the extent that any of these conclusions may represent findings of fact, the Court adopts them as such.

The economic-substance doctrine provides that "a transaction is not entitled to tax respect if it lacks economic effects or substance other than the generation of tax benefits, or if the transaction serves no business purpose." *Winn-Dixie Stores, Inc. v. Comm'r*, 254 F.3d 1313, 1316 (11th Cir. 2001). The first prong—economic effects—is objective, while the second prong—business purpose—is subjective. *Kirchman v. Comm'r*, 862 F.2d 1486, 1492 (11th Cir. 1989); *see also Karr v. Comm'r*, 924 F.2d 1018, 1023 (11th Cir. 1989). Both prongs must be satisfied for the transaction to be given tax respect. *See, e.g.*, *UPS of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001) ("Even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance.").

As to economic effects, "transactions whose sole function is to produce tax deductions are substantive shams, regardless of the motive of the taxpayer." *Kirchman*, 862 F.2d at 1492. The inquiry is thus "whether there was a reasonable possibility of making a profit from the transaction." *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1377 (Fed. Cir. 2010); *see also Black & Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006); *Gilman v. Comm'r*, 933 F.2d 143, 146–47 (2d Cir. 1991). Courts must conduct "a common-sense examination of the evidence as a whole" in making this determination because "the existence of *some* potential for profit [in isolated transactions] does not foreclose a finding of no economic substance." *Keeler v. Comm'r*, 243 F.3d 1212, 1219 (10th Cir. 2001) (emphasis added); *see also ACM P'ship v. Comm'r*, 157 F.3d 231, 258 (3d Cir. 1998) ("[A] prospect of a nominal, incidental pre-tax profit . . . would not support a finding that the transaction was designed to serve a non-tax profit motive.").

As to business purpose, "[a]sking whether a transaction has a bona fide business

purpose is another way to differentiate between real transactions, structured in a particular way to obtain a tax benefit (legitimate), and transactions *created* to generate a tax benefit (illegitimate)." *Stobie Creek*, 608 F.3d at 1379. "[P]repackaged strateg[ies] marketed to shelter taxable gain" have been held to lack business purpose. *Id.*

"[T]he tax consequences of an interrelated series of transactions are not to be determined by viewing each of them in isolation but by considering them together as component parts of an overall plan." *Crenshaw v. United States*, 450 F.2d 472, 476 (5th Cir. 1971). However, the focus is still on the specific transactions at issue, not the activities of the entity as a whole. *See Black & Decker*, 436 F.3d at 441 (noting that the test "focuses not on the general business activities of a corporation, but on the specific transaction whose tax consequences are in dispute"); *see also Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 545 (5th Cir. 2009) ("[T]he proper focus is on the particular transaction that gives rise to the tax benefit, not collateral transactions that do not produce tax benefits.").

The only other court to have considered the legality of the FOCus investment structure found it to be an abusive tax shelter lacking in economic substance. *See Nevada Partners Fund, LLC ex rel. Sapphire II, Inc. v. United States*, 714 F. Supp. 2d 598, 632–33 (S.D. Miss. 2010), *aff'd in relevant part*, 720 F.3d 594 (5th Cir. 2013), *vacated on other grounds*, 134 S. Ct. 903 (2014) (citing *United States v. Woods*, 134 S. Ct. 557 (2013)).[24] The *Nevada* court's survey of relevant case law is particularly

---

[24] The U.S. Court of Appeals for the Fifth Circuit affirmed the district court's finding that FOCus lacked economic substance; however, it vacated in part on a separate penalty issue. *See* 720 F.3d at 619. The Fifth Circuit's opinion was itself vacated on certiorari, 134 S. Ct. at 903, in light of the U.S. Supreme Court's recent decision in *Woods*, 134 S. Ct. at 560, which dealt solely with the penalty issue. Thus, based on the Court's understanding of the subsequent history, the *Nevada* district

thorough, and the Court finds the reasoning in that opinion on the issue of economic substance to be highly persuasive.

### B.    Discussion

The Court has found that every step of the FOCus series of transactions—the creation and setup of the partnerships, the Kearney FX straddle trades, the purchase of Nebraska and Lincoln, the yen carry trade, the capital contributions, the guarantee, and the sale of Kearney, *see supra* ¶¶ 72–77—were solely motivated by tax-avoidance. *See Gregory*, 293 U.S. at 469. Having made these intensive factual findings, the Court is inexorably led to one legal conclusion: the NLK FOCus fails both prongs of the economic-substance test. *See Winn-Dixie*, 254 F.3d at 1316. First, as described above, there was no reasonable possibility of making profits from any step of these transactions. *See Stobie Creek*, 608 F.3d at 1377. In fact, as the Court explicitly found, the structure of the transactions hampered any potential to make a meaningful profit.[25] *See supra* ¶¶ 38–44. Second, there was no legitimate business purpose for the transactions, as a multitude of evidence, *see, e.g.*, *supra* ¶¶ 51, 57, demonstrated that Bricolage specifically created the transactions to generate a tax loss for Mr. Sarma and that Mr. Sarma entered into the transactions solely for the tax benefits.[26] *See Stobie*

court's original holding with regard to economic substance remains intact, and this Court considers its reasoning sound. The Court does not consider the portion of the *Nevada* opinion relating to the penalty issue and relies solely on *Woods* in its determination of the penalty issue in the instant case.

[25] Though the trades made some actual profits, *see supra* ¶¶ 32, 53, they were de minimis compared to the amount invested and were plainly a byproduct of the shelter's intention as a whole to limit profit and, in fact, to produce large artificial losses. *See Keeler*, 243 F.3d at 1219; *ACM*, 157 F.3d at 258; *Nevada*, 714 F. Supp. 2d at 632. Furthermore, any profit that the partnerships made was, in reality, wiped away by the large fees that Mr. Sarma paid to purchase them. *See supra* ¶¶ 39, 45.

[26] Although Mr. Sarma and Bricolage continued to do business together and the partnerships went on to make actual profit in later years, that fact does not foreclose a

*Creek*, 608 F.3d at 1319. The fact that the Bricolage and KPMG PowerPoint presentations shown to Mr. Sarma at the outset of the scheme mirror the actual facts as they developed at every turn is compelling evidence that the NLK FOCus was conceived purely as a tax shelter—one that performed exactly as planned. (*See* D-26; D-124.) In sum, the transactions at issue lacked both economic effects and a legitimate business purpose and thus are not entitled to tax respect. *See UPS*, 254 F.3d at 1018. Accordingly, the IRS' FPAAs properly eliminated the tax consequences of the NLK FOCus shelter. *See Nevada*, 714 F. Supp. 2d at 634. The IRS' adjustments will stand.

## IV. Penalty

### A. Standards

"[N]otwithstanding that every penalty must be imposed in partner-level proceedings after partner-level determinations, TEFRA provides that the *applicability* of some penalties must be determined at the partnership level." *Woods*, 134 S. Ct. at 564. Thus, courts have jurisdiction in partnership-level actions to "determine the applicability of any penalty that could result from an adjustment to a partnership item . . . ." *Id.*

### B. Discussion

The Court has already determined at the summary judgment stage that it has jurisdiction to review whether Mr. Sarma's disclosure complies with Announcement 2002-2. (Doc. 186, pp. 9–15.) The Court concludes that it also has jurisdiction to determine whether the IRS' imposed accuracy-related penalties are

---

finding of no business purpose. *See Nevada*, 714 F. Supp. 2d at 633 ("The FOCus steps cannot be viewed by this court as simply part of the subsequent successful investment history with Bricolage."); *see also Black & Decker*, 436 F.3d at 441; *Klamath*, 568 F.3d at 545. Rather, it actually supports the Court's conclusion because ongoing investment was part of the scheme to create the illusion of bona fide transactions at the outset. *See supra* ¶ 66.

applicable in this partnership-level proceeding. *See Woods*, 134 S. Ct. at 564. To reach the applicability issue, the Court must first determine a threshold question: whether the partnerships are eligible for the amnesty provision in Announcement 2002-2 due to Mr. Sarma's disclosure.

As noted above, the Court is persuaded that Mr. Sarma had both the intention and the authority to make his disclosure on behalf of the partnerships. *See supra* ¶¶ 67–71. The IRS seeks to elevate form over substance by parsing the wording of the disclosure, particularly the use of personal pronouns; the IRS contends that this use demonstrates that Mr. Sarma filed the disclosure solely in his individual capacity. (*See* Doc. 194.) The Court disagrees. The disclosure appears to be a perfectly rational response to the Announcement; it mentions Bricolage, Nebraska, Lincoln, and trading conducted by an entity owned by Lincoln. (P-68.) The fact that the disclosure was jointly prepared by Mr. Sarma and Bricolage further convinces the Court that the intention was to disclose the shelter on behalf of the partnerships. *See supra* ¶ 68. Further, the partnerships' operating agreements denominate Mr. Sarma as the "controlling member," as opposed to Bricolage as the "administrative member"; the agreements grant the controlling member broad authority to "make or approve all Major Decisions" of the partnerships. (*See* J-100.) Coupled with the fact that Bricolage consented to the disclosure, *see supra* ¶ 70, the Court concludes that Mr. Sarma had the authority to file the disclosure on behalf of the partnerships and did so.

Ultimately, the purpose of the Announcement was to call out questionable behavior for scrutiny. (*See* P-67.) Mr. Sarma relied on the Announcement in disclosing his investment in the partnerships, which led to the discovery of the NLK FOCus shelter and the existence of this case. It is disingenuous for the IRS to turn around now and

apply penalties for a shelter pursuant to an Announcement that prompted the uncovering of the shelter in the first place. The IRS will be held to the terms of its bargain. The Court therefore concludes that the accuracy-related penalties imposed in the FPAAs are waived because Mr. Sarma's disclosure, made on behalf of the partnerships, was compliant with Announcement 2002-2.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.      The FPAAs properly found that the partnerships lacked economic substance and made adjustments accordingly; however, they improperly imposed penalties. Thus, pursuant to Federal Rule of Civil Procedure 58, the Court will enter a separate judgment: (1) in favor of Defendant and against Plaintiffs as to the lack of economic substance of the partnerships and the adjustments in the FPAAs; and (2) in favor of Plaintiffs and against Defendant as to the penalties, which are waived pursuant to Announcement 2002-2.

2.      The Clerk is therefore **DIRECTED** to close this case.

3.      On or before Thursday, March 20, 2014, the parties are **DIRECTED** to submit to the Chambers email a joint proposed form of final judgment in Word format.

**DONE AND ORDERED** in Chambers in Ft. Myers, Florida, on March 6, 2014.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record